## IN RE WILLIAM L. NEWBY.

FILED SEPTEMBER 16, 1908. No. 14,175.

Attorneys: DISBARMENT: EVIDENCE. In proceedings for disbarment, the presumption of innocence applies, and the culpability of the respondent must be established by a clear preponderance of the evidence.

ORIGINAL application for disbarment of William L. Newby. *Dismissed.*

*W. T. Thompson, Attorney General, Grant G. Martin* and *W. B. Rose,* for informant.

*William L. Newby, W. G. Hastings* and *A. G. Wolfenbarger, contra.*

LETTON, J.

This is an original proceeding in disbarment upon an information filed by the attorney general under the direction of the court. In order to understand the peculiar condition of the record, it will be necessary to give a history of the proceedings in this and other cases based upon the same facts. This proceeding had its inception in this court on March 10, 1905, when the attorney general filed

a somewhat informal motion for an order to confirm a judgment of the district court for Saline county disbarring William L. Newby from the practice of law, and for an order revoking and canceling the certificate of Newby to practice law in the several courts of this state. The motion set forth that it was based upon a transcript of the proceedings of the district court for Saline county in the matter of the disbarment of Newby filed therewith. Pending proceedings upon this motion, on June 10, 1905, the respondent filed a petition in error seeking a review of the judgment of the district court for Saline county referred to in the motion. The error case was duly argued and submitted, and on May 3, 1906, in an opinion by SEDGWICK, C. J. (76 Neb. 482), the judgment of the district court was affirmed so far as it disbarred Newby from practice in the courts of the Seventh judicial district, but reversed as to the order of disbarment generally; it being held that, since this court was the only court in the state which could admit to practice in all the courts of the state, it alone had the power to enter an order annulling such admission. Pending the hearing of the error case, the proceedings in this case were suspended. Following the disbarment proceeding in the district court, respondent was prosecuted criminally in that court upon a criminal charge growing out of the same transaction. The criminal action was still pending at the time of the filing of the opinion referred to, which was made to appear to this court, and it was ordered: "Further proceedings in this court upon the main charge against the defendant are continued until the final determination of the criminal proceeding now pending in the district court for Saline county. When those proceedings are finally disposed of, it will be the duty of the attorney general to so inform this court, and further proceedings will then be taken thereon."

In December, 1907, a motion was made to dismiss the proceedings on the ground that the criminal charge had been dismissed and the defendant discharged. This mo-

tion was overruled, and the attorney general was directed to file a formal complaint for disbarment in this court. In compliance with this direction, a formal information was filed, charging that in practicing his profession the respondent "has been wanting in good moral character, has been guilty of deceit and collusion with intent to deceive a court, and has also been guilty of irregular, unlawful and unprofessional conduct in the following particulars." Then followed a copy of the information filed in the district court for Saline county, which charges, in substance, that Newby had impersonated a deceased person before a notary public in Oklahoma, had forged the name of such deceased person to a warranty deed conveying certain premises then in litigation in the district court for Saline county, had assumed to appear for said deceased person as an attorney at law in that court, knowing at the time that his purported client was dead, and had thereby knowingly and wilfully deceived the court and the parties to the action. The information filed by the attorney general further charges that upon a trial in the district court Newby was found guilty and disbarred, and that the conviction was affirmed in this court so far as it disbarred the respondent from practicing in the courts of the Seventh judicial district. To this information the defendant filed an answer, admitting the disbarment proceedings in Saline county, and denying specifically every other allegation of misconduct, deceit or collusion contained in the information. Upon these issues the attorney general introduced in evidence the bill of exceptions containing the evidence taken upon the disbarment proceedings in Saline county, and the bill of exceptions containing the evidence taken in the criminal trial in the same court. Original evidence was taken by the respondent in the form of depositions. The case was argued and submitted upon the issues raised by the information and answer, and upon the evidence thus produced.

The peculiar and unusual condition of the evidence re-

quires that it be distinctly borne in mind that there are three distinct masses of testimony before us, each taken at different times and in different proceedings. The first is the evidence in the disbarment proceedings before the district court, which was taken in the latter part of March and early in April, 1904. The second is the evidence taken upon the criminal trial, which was held in December of the same year; and the third consists of the depositions taken directly in this proceeding in June, 1908. An interval of between two and three years intervened between the taking of the first and last of this testimony. It may be noted also that different attorneys represented Mr. Newby in the different proceedings, as this has some bearing upon the final determination of the case. The most important testimony in the disbarment procedings in the district court was given by one E. J. Garner, a notary public, residing in Coyle, Logan county, Oklahoma. He testified that on the 15th day of June, 1903, which was several months after the death of Charles E. Jennings, the true owner of the property in question, a man who was a stranger to him came into his office in Coyle, and there signed and acknowledged in the name of Charles E. Jennings a warranty deed to the property in question; that he fixed the date by a record which he kept of his notarial work (this record was introduced in evidence); that he afterwards recognized Newby in Friend, Nebraska, as the man who signed and acknowledged the deed. He testified that at the time of the execution of the deed Newby had no beard other than a mustache, and that the deed was acknowledged in the afternoon of that day. The deed itself was not in evidence, but the record of it which was introduced showed the date of acknowledgment to be June 5.

Other evidence showed that early in 1903 Newby went to one A. D. Jennings, a resident of Lincoln, Nebraska, who had formerly lived in Friend, and asked him if he did not have a son by the name of Charles E. Jennings, and said that if the son owned this property there would

be a consideration in it for him. Lafe Burnett, an attorney who resided at Wilber, the county seat of Saline county, testified that at the opening of the March term of court, 1904, and before the hearing in the disbarment proceedings, Newby showed him the forged deed, and told him he could prove he was not in Oklahoma at the time the deed was dated; that Charles E. Jennings was a traveling salesman, and that he had been at Newby's house in Friend two weeks before. He also testified that in February, 1903, he, Burnett, received a letter from Guthrie, Oklahoma, written in script, signed by Charles E. Jennings, asking him to appear in the tax foreclosure proceedings, and inclosing a copy of the publication notice of the beginning of the suit; that after he had done so, and had obtained leave to answer in 30 days, he wrote Jennings to that effect, and that he received another letter with a draft of an answer and a check for $40 in June or July, 1903, and that he then filed an answer as attorney for Charles E. Jennings; that he replied to these letters, using a return card upon the envelope, and that the letters were not returned to him; that the draft was made payable to Joseph W. Shabata, clerk of the district court, and that he had never written Jennings the name of the clerk. He further testified that he examined the deed and acknowledgment at the first of the term, and that he did not notice anything that indicated an erasure or change in the date, or anything scratched or rubbed out. It was also shown that in February, 1904, Newby filed the forged deed for record with the county clerk of Saline county. A number of other circumstances were in evidence which tended to support the conclusion of the committee that Newby was guilty as charged. On the other hand, a number of witnesses testified positively that Newby left Friend, Nebraska, for Oklahoma on June 7 or 8, that at that time he had a full beard and mustache, and that he returned to Friend upon the 6th of July still wearing a full beard. H. W. Newby of Guthrie, Oklahoma, his elder brother testified that on June 15 Newby worked

with him and other men laying a lateral sewer to his house in Guthrie, that Coyle is 18 miles northeast of Guthrie, and that communication was such that it would have been impossible for W. L. Newby to have been in Coyle upon that day without his knowledge. He testified, also, that W. L. Newby wore a full beard and mustache at that time. In rebuttal a number of witnesses who lived at Friend or its vicinity testified that at and before the time that Newby started for Oklahoma in June, 1903, they saw him, and that his face was shaved clean except for a mustache. As the evidence then stood, while it was contradictory, it seemed to be sufficient to sustain the findings of the bar commission and the order of the district court. Following these proceedings, Newby was prosecuted and convicted upon the charge of uttering a forged deed, but the judgment of conviction was reversed by this court on account of a defect in the indictment. No new trial was had, and in November, 1906, upon a showing made of inability to prosecute the action, leave was given the county attorney to enter a *nolle prosequi*, and the defendant was discharged. The testimony taken in the criminal proceeding, while in the main identical with that taken before the bar commission, shows the following additional facts: Several witnesses testified that at the time the forged deed was in the office of the register of deeds to be recorded their attention was called to the deed and to the acknowledgment, that there appeared to be a blot or blur before the figure 5 in the date June 15, and that it appeared as if something had been erased and blurred or blotted over before the figure 5. None of the witnesses testified, however, to seeing anything more than a blot or blur. The witness Vandine testified that he took the deed and held it up to the light, but could not discover any figure under the blur. The testimony at this time was also in direct conflict with reference to whether or not Newby had only a mustache or had a full beard when he went to Oklahoma in June, 1903. There was additional testimony given by several witnesses, who say

they worked upon the sewer with him, to the effect that Newby worked all day in Guthrie on June 15, 1903, the day that Garner testified he signed the deed in Coyle. At this trial Newby testified that he received the forged deed by mail from Guthrie on June 8, 1903, at the railroad station in Friend; that he sent it to his mother, the grantee, Malinda Smiley, after he showed it to Burnett on the first day of the March, 1904, term of the district court, on the advice of counsel; and that he procured it back from his mother in May, 1904; and his wife testifies that it was burned with his house at the time the house was destroyed by fire in November, 1904. Part of this evidence is corroborated by the testimony of Paul Newby, the son of respondent, who says that on June 8 he procured from the post office in Friend a long envelope containing a paper, that he handed the same to his father at the railroad station in Friend, who opened it and took therefrom the deed in question. A long envelope is also in evidence which is postmarked "Coyle, Oklahoma, June 5, 1903," and "Friend, Neb., June 8, 1903," and which is addressed to "W. L. Newby." Two witnesses who managed the Occidental Hotel in Guthrie, Oklahoma, at different periods in 1903, testified that a man registering as Charles E. Jennings lodged at this hotel in January, 1903, and on June 21, 1903, describing him as not as large a man as Newby, with dark hair and mustache. The hotel register, or that portion of it containing entries showing registry by Charles E. Jennings on June 9, 1902, October 11, 1902, July 23, 1903, and June 21, 1903, was introduced in evidence, but is not with the bill of exceptions. There is further testimony from a carpenter that a man of like description came to a house in Guthrie where Newby was working with him in June, 1903, and had a conversation with Newby. The city engineer of Guthrie, Oklahoma, testified that the sewer upon which a number of witnesses swear Newby was working on June 15, was finished a day or so prior to June 16. There is

also in evidence a bank draft issued by a bank at Coyle, dated "Coyle, Oklahoma, June 15, 1903," for the sum of $40, payable to J. W. Shabata, clerk of the district court, which draft Lafe Burnett testifies he received by mail inclosed with a letter signed "Charles E. Jennings," as a tender to be made to redeem from taxes in the tax foreclosure case, and which was delivered by him to Mr. Shabata for that purpose.

The substance of the evidence taken directly in the present proceedings in this court is about as follows: William L. Newby testifies that he did not sign the forged deed; that the first time he saw Charles E. Jennings was in Guthrie, Oklahoma, in June, 1903; that he had considerable correspondence with Jennings before that time, and that Jennings came to where he (Newby) was working with some carpenters erecting a house for his brother, H. W. Newby, to get the balance of the purchase price of the lots he had sold to Newby; that he inquired for Mr. Newby and introduced himself as the man with whom he had been corresponding, and that he had Newby's letters; that in January, 1903 he first received a letter through the mail from Charles E. Jennings. The letter and the envelope in which he testifies it was inclosed are in evidence. This envelope is postmarked "Guthrie, Oklahoma, Jan. 29, 1903," is addressed "William L. Newby, Atty., Friend, Neb.," with the request: "After 10 days return to Charles E. Jennings, Guthrie, Oklahoma." A clipping of the publication notice was inclosed notifying Charles E. Jennings of the beginning of the tax foreclosure suit. The letter is as follows: "Guthrie, Okla., 1-28, 1903. William L. Newby, Attorney, Friend, Nebraska. Dear Sir: I inclose a notice which you will doubtless understand. I left Friend some years ago. Then this property was considered worthless. I intended to return at that time when things were looking up some but failed to do so. I left my property in charge of a man there and I guess he has not looked after it very well. His name was George Long. I want you to appear for me and save it if

it is not too late and is worth it. I wish you would look up and see what it has been renting for and who has been renting it; if it has been rented try and get some of the rent. I write you because I heard you try a case against one Riley Cron and afterwards you preferred charges of gross immorality and wife desertion against him in the Woodmen camp of which he was a member. You may remember the fellow that defended Cron in the M. W. A. Let me hear from you as soon as you can. Respectfully, (Signature in script.)    Charles E. Jennings." Newby testified that he remembered the incident as to the case against Cron. Reading from the letter-press copy in his letter book, he testifies that on the 2d of February, 1903, he answered that letter as follows: "2-2-'03. Mr. Charles E. Jennings, Guthrie, O. T. Dear Sir: Your favor of recent date is at hand. It with inclosed copy of publication has had my careful attention. While I thank you for the letter and the offer of the case I have promised George A. Taylor, the husband of the plaintiff, that I would not appear in the case against his wife. Mr. Taylor has been collecting the rent of Mr. Smith, who is joined with you, for over a year. The property is worth I understand about $200, although I have never seen it. Am not able to say what condition it is in. There are plenty of attorneys at Wilber, the county seat, that can and will handle your case for you. You will find the following all square fellows: Lafe Burnett, Frank Bartos, Will Mc-Gintie, Grimm & Son. There are others, but I think that their charges would be higher than you would want to pay. It is quite a while till court meets. I remember the case you refer to, I felt quite warm at you for defending Cron, but the boys said that you were a stranger and did not know who you were. Thanking you for the offer of your case and hoping to be able to serve you some other way, I inclose our card and close. I am earnestly yours, William L. Newby." That he received the following letter in reply (the letter itself being introduced in evidence): "Guthrie, Okla., Feb. 7, 1903. W. L. Newby, Attorney,

Friend, Nebraska. Dear Sir: Your letter is at hand. I am sorry that you cannot look after that matter in court. I will write to the party that you speak of at Wilber. I never had the man Taylor to rent my property, as I see you say that he has collected rent for over a year. See that man Smith that you say was renting of him and write me how much rent he has paid him. Can you find a buyer for this place at what you wrote me it is worth. I don't suppose that you agreed not to sell it. I will pay you a good commission if it can be sold for cash. I am going down in Caddo county for a few days. I will write you from there if I am gone long. Respectfully, (Signature in script.) Charles E. Jennings."

That in reply to this he wrote the following: "2-16-'03. Mr. Charles E. Jennings, Guthrie, O. T. Dear Sir: Your favor of the 2-7-'03, was duly received and contents noted. No; I did not agree not to sell the place or not to buy the place, I only agreed not to take the other side of the case in court against the foreclosure proceeding. Yes; I think that we can find you a buyer if you will pay us a good commission. Say what we could get above $200 you to redeem from the tax sale. I saw Mr. Smith and find that he paid over $52 as rent to Taylor. That he told him it was his wife's property. That his wife needed the money. That being the case Taylor can be made to account for all of the rent which will more than reimburse them for what they paid out for taxes. I think you can get enough out of them so that the $200 will be clear to you. If this suits you you can write me as to whether you have an abstract to this property or not and what terms you will sell it on. With best wishes, I am earnestly yours, William L. Newby." That he received another letter, which he has lost and cannot find, though he made careful and diligent search for it. He says that in that letter Jennings wrote: "He would take $200 for the place; that his abstract was misplaced, and if I could to find a buyer."

That in reply to this he wrote the following letter: "3-18-'03. Mr. Charles E. Jennings, Guthrie, O. T. Dear

Sir: Your favor of recent date received and noted. I am sorry to hear that your abstract is misplaced. I will, however make inquiries as to the title being in you and clear of incumbrances and can so satisfy any inquiries on that point, in the meantime you may find it. If so you will please to forward the same to me. I think that I can find you a buyer at your price on monthly payments of about $10 each, with 7% interest and a payment to start with of say $50. Would these terms be satisfactory to you? The costs in the tax foreclosure cannot be very much, as the law only gives them $1 for giving the notice of time for redemption from tax sale, with a tender in court for what is due them and a development of what they had collected in rents before bringing their suit they would have to pay all costs subsequent to the giving of the notice of time to redeem. You would then receive enough from Taylors to pay your attorney fees and all back taxes. Wishing you success and asking an early reply, I am earnestly yours, William L. Newby."

That a letter was received in reply to this, which he is unable to find, but the substance of it was "that he would take the $200, but wanted to get it nearly all cash, as nearly all cash as possible."

That in answer to that he wrote the following letter: "5-1-'03. Mr. Charles E. Jennings, Guthrie, O. T. Dear Sir: I have a buyer for your house and two lots here at the price of $200 net to you. Payable as follows: One hundred and fifty dollars on receipt of a proper warranty deed the remaining fifty dollars to be paid on your making the proper tender in court to redeem from the tax suit of Ella A. Taylor. I do not think that there is any question as to your getting back the money that you would have to send Mr. Shabata the clerk of our district court to make this tender which should be made with your answer in that case. You would simply have to be out of the use of about $40 for a little while. There is several defenses that should be set up in your answer any of which will defeat them. Our laws require the follow-

ing things done before one can successfully foreclose a tax lien in this state. A duplicate certificate should be issued at the time of the tax sale by the county treasurer showing to whom the sale was made, the amount sold for, and which should be filed with the county clerk. The county clerk for the county should issue a list of the lands to be sold for taxes which should be properly signed up. The county clerk should also issue his warrant to the county treasurer to collect the delinquent taxes and turn over to the treasurer a tax list under the seal of his office authorizing the county treasurer to proceed to collect the delinquent taxes. I know that none of the above things have been done for the years 1894, '95, '96, '97, '98 or '99 because I have been interested in other cases and had occasion to look it up. I have made some inquiries as to the ability of Mr. Burnett to draw pleadings and I think it best for you to go to some lawyer there and have an answer drawn such as you want filed and send to Mr. Burnett. I would draw it were it not for my promise. Of course if you sell to our buyer I will expect you to give me authority then if necessary to protect the title to appear in the case so that the buyer would not suffer. Kindly let me hear from you at an early date as to whether you will sell as above spoken of, I am going away as soon as our next term of court is over and will want to get this arranged before then if possible. I expect to make your country a visit as I have a brother living in your town. I am earnestly yours, William L. Newby."

That the next communication was the letter which accompanied the deed, and which he received on June 8 at the station in Friend. This letter is as follows: "Coyle, Okla., June 5, 1903. W. L. Newby, Friend, Neb., Dear Sir: I am sending you with this letter the deed to lots 144 and 145 Bentleys addition to Friend, Neb. You will please to deliver the same to Mrs. Smiley and send the amount I was to have $200 to me, or if you are coming to Guthrie soon, as you spoke of in your letter you can bring

the money with you.  I will see that the tax suit is redeemed from, but you must look after it some too so that it is properly taken care of.  Respectfully, (Typewritten signature.)    Charles E. Jennings."

That the next communication he had was the following letter, which was mailed to him at Friend, but was forwarded to him at Guthrie, and that in reply thereto he wrote Jennings, telling him where he was, and requested him to come and see him at his brother's home in Guthrie:  "Coyle, Okla., June 12, 1903.    Mr. W. L. Newby, Friend, Neb.  Dear Sir:  Inclosed you will find an answer that I have drawn from the information that I have in regard to the law and the matters about the suit of Ella A. Taylor against Jennings.  I want you to look this answer over and if there is anything that needs changing or adding to make it all do so and return to me and I will then send it to the attorney that I have employed to defend this case.  I will also send a draft to the attorney of $40 to redeem lots 144 and 145 in Bentleys addition to Friend, Saline county, Nebraska.  I have looked over the copy of the bill or petition sent me and the law and I see that they are not entitled to interest, as you have said in your former letters the clerk must sign the certificate and a duplicate must be filed with the clerk.  As there is only $1 allowed for giving notice of the time redemption is to expire, I think what I have sent draft for sufficient for all purposes of redemption.  I desire that an accounting be had at the hands of Mr. Taylor, the husband of Ella Taylor, I want that if it is needed for to protect this suit that you appear in the case and help the attorney that I employed on your suggestion.  Asking an early reply, I am respectfully, (Typewritten signature.) Charles E. Jennings."

That Jennings came to see him at Guthrie, and that he there paid him $200 for the property.  That just after his answer to the last letter he (Newby) wrote to the clerk of the district court for Saline county, and asked him whether there had been a tender made to redeem,

and received a letter that there had been. That he told
Jennings that, if it was necessary, he would appear in
the case, but he did not want to do so unless it was neces-
sary, as he did not want the enmity of Taylor, the plain-
tiff in the case. That he left Guthrie for Friend upon the
4th day of July, got home upon the 6th, was only home 24
hours when he came back to Guthrie, and did not return
to Friend again until the 6th of November of that year.
That he took no action in the foreclosure case until the
March following, because he found on investigation that
Mr. Lafe Burnett had filed an answer practically setting
up everything he had suggested to Jennings in · the cor-
respondence. That in March, 1904, he was told that one
Charles E. Jennings, who lived in Lincoln, had made a
deed to the property, and was going to withdraw the ten-
der in the district court. That he then immediately
placed the deed upon record, and filed a petition in in-
tervention on behalf of Mrs. Smiley, the grantee in the
deed. That he did not then or afterwards represent Mr.
Jennings in the litigation, and only appeared for Mrs.
Smiley. That as soon as the question was raised as to
whether the man with whom he dealt was the real owner
of the property he wrote Jennings that it was claimed
the deed was a forgery, and that he wanted him to come
immediately and defend it. That he addressed the letter
to Guthrie, but received no answer. That later, in June,
he wrote a letter to Jennings, and sent it to his sister at
Mounds, I. T., asking her to mail it from there, which
letter was returned to her (the letter and envelope are in
evidence addressed "Charles E. Jennings, Guthrie, Okla-
homa," with request for return, if not delivered). That
after this he went to Guthrie, and endeavored to find
Jennings, but could find no trace of him until he went to
the Occidental Hotel, where he found a man had been
registered by that name. That from there he went to
other points in Oklahoma endeavoring to find Jennings,
and that until he received a letter from Dr. Gooch at
Lawton, informing him that Jennings died on October

13, 1902, he had no knowledge of the death or of the existence of the man who is now claimed to be the genuine Charles E. Jennings, and that after he received this letter he made a trip to Lawton, and ascertained the facts as to the true owner.

He further testifies that he never saw the notary, E. J. Garner, of Coyle, Oklahoma, until he saw him in the streets of Friend, and that he never appeared before him to acknowledge an instrument of any kind. That shortly after the filing of the complaint in disbarment Mr. Ellsworth came past him on the streets of Friend accompanied by a stranger, and that just as they passed him Ellsworth remarked to the stranger, "That's him." That he afterwards learned that the stranger was E. J. Garner. He also introduced in evidence a copy of an answer and a cross-petition filed in the divorce case of *Cron v. Cron* in an Oklahoma court, which he testified is the case referred to in Jennings' first letter. He testified, further, that Malinda H. Smiley is his mother, and that she had no money with which to buy this property; that he bought it for her with his own means, and without consulting her, and for the purpose of furnishing his mother a home. On cross-examination he testifies that he did not offer any of these letters in evidence in the disbarment proceedings or in the criminal case; that he showed them to his counsel in these cases, and was advised not to use them; that he saw the man who defended Cron before the Woodman lodge, but did not know at the time that his name was Jennings; that Jennings sent him a draft of the answer to be made in the case; that he made some corrections in it, and returned it to him; that this was afterwards sent to Mr. Burnett at Wilber by Jennings; that the answer filed by Burnett was substantially a copy of this, and that in his petition in intervention he used much of the same matter contained in the answer filed by Burnett; that he paid the $200 to Jennings in cash; that Jennings claimed to be selling musical instruments; that he, Newby, arrived in Guthrie on the 10th of June, 1903, and

left on Saturday evening the 3d or 4th of July, and that he was in the city of Guthrie during all the intervening time; that before receiving the letter from Jennings he had not inspected the property; that immediately after the filing of the disbarment proceedings he went to Mr. Burnett, and requested him to show him the letter that he had from Jennings, so that he could compare the signature with that upon the deed; that upon the suggestion of one Elias Baker, he sent the deed to his mother; that the deed was returned to him by the post office department on account of misdirection, and that he kept it until his house burned; that he had no knowledge the disbarment proceedings would be begun until the morning he appeared in court, and that the next day he came to Lincoln and employed counsel; that his counsel advised him to produce the deed; that he said he could not, but would send for it, and that he immediately sent for its return, but the hearing was over and the report filed before it came back; that he directed Jennings to make the deed to Mrs. Smiley on a separate memorandum, and not in the letter, which was a practice of his in like matters. He also testifies that after he investigated and found that the man who made the deed had no right to make it he had nothing to do with the property afterwards. Among other matters, he denies that he told Burnett he knew Jennings personally, but says he told him he was a man who sold musical instruments.

A witness who testified in both of the former trials as to seeing Newby at the station in Friend on the morning of June 8 now adds the further testimony that at this time he saw Paul Newby bring his father a long envelope, from which Newby "took out a paper, and, holding it up before him, said: 'There is the deed for those Jennings lots. That ends that controversy.'" The witness further identifies the envelope in evidence. On cross-examination he testified he did not see a letter in the envelope, but saw the indorsement on the back of the deed, and, as a reason for not mentioning the matter when giving tes-

timony before, stated that he was not asked any questions in regard to this.

A number of witnesses residing at Friend and vicinity testify that Newby's reputation for honorable professional conduct was good, except in the matter growing out of the Jennings deed, and that his reputation for honesty and truthfulness was good. Messrs. R. D. Stearns and A. G. Wolfenbarger, of Lincoln, Nebraska, testify that they were Newby's counsel in the disbarment proceedings; that demands were made for documents and for the testimony of Newby, which they advised him not to give at that time; that their recollection is that the deed itself was not in Newby's possession at that time; that they saw the deed after the disbarment proceedings, and that it was their opinion that it was not Newby's handwriting, and that in their opinion whoever wrote the body of the deed, wrote also the acknowledgment; that they were in the same identical handwriting, and were written, in all probability, at the same time, as the same kind of ink was used; that at the time of the disbarment Newby told them that he had sent the deed to his mother. Mr. Wolfenbarger also testifies that the signature to the deed was much coarser than the writing in the body of it, and in his opinion was not made by the same man. He also testifies that about the time of the disbarment proceedings he saw the several letters now introduced in evidence for the first time, and that it was not deemed wise by counsel at that time that the letters should be used in the defense; that without the deed they thought they were of small consequence; that they were anxious to secure the original deed and expected to get it. He further testifies that he was unable to attend the latter part of the hearing on account of ill health, and that several matters were not presented in Mr. Newby's behalf that might have been; that one of the reasons for keeping the testimony from the bar committee was the fact that it was known that a criminal charge was to be filed at the close of the disbarment proceedings, and it was thought

unwise to anticipate the defense. The evidence further shows that in the case of *Taylor v. Jennings* no pleadings of any kind were filed by Newby as attorney for Charles E. Jennings; that the only paper filed by him in which that name appears at all was in a claim for an attorney's lien which he signed as attorney for Charles E. Jennings and Malinda H. Smiley. The pleadings filed by him were as attorney for Malinda H. Smiley, and the evidence is that Mr. Lafe Burnett appeared as attorney for Charles E. Jennings in all pleadings filed for him.

A multitude of facts more or less collateral to the main issue and throwing light upon the same in greater or less degree are to be found in the record, which consists of over 800 pages of typewritten matter. From such a mass of testimony we have been able to do no more than to give a few of the most salient points, and many circumstances related are not mentioned in this resume. In an experience extending over many years the writer has never encountered such a mass of improbable, contradictory, and unusual evidence, and it is impossible to doubt that a number of wilful misstatements have been made by some of the witnesses.

While the proceedings in this matter are not criminal in their nature, in view of the momentous consequences to the person charged, involving his means of obtaining a livelihood from his profession and his reputation as an honest and honorable man, the presumption of innocence applies, and his culpability must be established by at least a clear preponderance of the evidence. The court should be satisfied to a reasonable certainty that the charges are true. *State v. Wines*, 21 Mont. 464; *In re Parsons*, 35 Mont. 478; *In re Smith*, 73 Kan. 743. In fact, a New York court held that "the deprivation for life of a man's vocation should only result from grave malpractice established beyond a reasonable doubt." *Matter of Mashbir*, 44 N. Y. App. Div. 632, 60 N. Y. Supp. 451. Upon the crucial fact in this case, whether or not the respondent appeared before Garner in Coyle, Okla-

homa, on the 15th day of June, 1903, on the one hand, there is the positive evidence of Garner, and in addition many circumstances which, taken together with Garner's evidence, lead to the conclusion that Newby then and there personated Jennings, while, on the other hand, there is the positive testimony of five or six individuals having no apparent interest in the matter, as well as that of Newby himself and his brother, H. W. Newby, to the effect that he was present at his brother's home in Guthrie, Oklahoma, all that day. Again it is established that Charles E. Jennings, the owner of the property, died in October, 1902, and yet several individuals testify to the presence of a man calling himself Charles E. Jennings in Guthrie, Oklahoma, at various times after that up to June 21, 1903, and the hotel register shows that some one registered under that name after Jenning's death, and at a time when there is no evidence that Newby was in Oklahoma. Again, the evidence furnished by the letters, envelopes and postmarks tends to corroborate Newby's story, improbable though it seems to be. Newby's explanations and accounts of his sending the forged deed to his mother and its return to him are self-contradictory and most improbable, but yet the attorneys who represented him in the disbarment proceedings, men of high character and standing, testify in a manner somewhat corroborative of him, and further say they saw the deed, and give reasons why they advised the withholding of the documentary evidence presented now for the first time. In fact, whichever theory of the case we adopt, it seems full of difficulties and improbabilities. Considering the whole of the testimony in all its bearings, we cannot say that we are satisfied to a reasonable certainty that Newby actually personated Jennings before the notary, and that he afterwards wilfully attempted to deceive the court by asserting that Malinda H. Smiley was the owner of the property in litigation, when, as a matter of fact, he knew that the heirs of Charles E. Jen-

nings were the true owners, and that the deed was a forgery.

We cannot say that we are satisfied from the evidence that he is innocent of the charges made against him, nor can we say that we are satisfied to a reasonable certainty of his guilt. The mind of the court being in this condition, it is our duty to give Mr. Newby the benefit of the doubt, and to hold that the charges have not been sustained by the evidence to such an extent as to warrant the infliction of the severe penalty that must inevitably have followed had we been fully satisfied of his guilt.

The proceedings, therefore, are

DISMISSED.