7978

*EX PARTE* GADSDEN.

Attorneys—Fraud.—The Court, investigating, at his own instance, the
appeal of his client having been abandoned against his protest, the
acts of an attorney in procuring from a lady not versed in business
matters, and not advised by counsel, an assignment of her interest
in an estate, the administratrix of which he represented, by which
the administratrix was personally largely benefited, finds that he is
not guilty of any intentional misrepresentation of facts, but that

the assignment is invalid and his acts reprehensible on account of the fiduciary relation existing between the parties and the inequality between them in information as. to the value of the estate and knowledge of business matters. The power of the Court in such cases stated.

Petition of Philip P. Gadsden *in re* J. M. Lawrence *et al.* against E. Charlotte Lawrence *et al.*

*Messrs. Wm. C. Miller* and *J. P. K. Bryan,* for petitioner.

*Attorney General J. Fraser Lyon,* contra, at the request of the Court.

July 20, 1911. The opinion of the Court was delivered by

MR. JUSTICE WOODS. The matter to be considered and decided in this cause is whether Philip H. Gadsden was guilty of such false representations or other misconduct in procuring from Miss Mary Lawrence an assignment of her interest in the estate of Joseph S. Lawrence to Mrs. E. Charlotte Lawrence, as would warrant this Court in ordering his name to be stricken from the roll of attorneys, or in inflicting any other penalty.

This issue grew out of the settlement of the estate of Dr. Joseph S. Lawrence, who died at Capon Springs, West Virginia, in August, 1899. His family consisted of his wife, E. Charlotte Lawrence, and two minor stepchildren. Diligent search having failed to disclose a will, the widow E. Charlotte Lawrence applied for letters of administration, which were granted to her on October 25, 1899. Upon inquiry it was discovered that the only person entitled to take with the widow under the statute of distributions was Miss Mary Lawrence, a half sister, living at Halcyondale, a small village in the State of Georgia. Philip H. Gadsden was the attorney for Mrs. E. Charlotte Lawrence, and in that capacity he went to the residence of Miss Mary Law-

rence and there obtained from her on November 3, 1899, an assignment to Mrs. E. Charlotte Lawrence of all her interest in the estate of her brother, for the consideration as therein expressed of "love and affection for my sister E. Charlotte Lawrence and other valuable consideration to me paid." Miss Mary S. Lawrence died in 1905; and her heirs and distributees on November 7, 1907, brought an action to set aside the assignment, alleging fraud and misrepresentation in the procuring of the assignment and the mental incapacity of Miss Mary S. Lawrence to execute such a paper. Joseph M. Lawrence, having been thereafter appointed administrator of the estate of Miss Mary S. Lawrence, was made a party plaintiff in his representative capacity and appropriate amendments were made to the complaint. The Charleston Consolidated Railway, Gas & Electric Company was made a party defendant, but it had no real interest in the controversy, and its answer consisted of a formal denial on information and belief. By her answer Mrs. E. Charlotte Lawrence denied the allegations of misrepresentation and fraud, and of the incapacity of Miss Lawrence, and set up the statute of limitations as a further defense.

The trial of the cause resulted in a decree of Hon. Robert Aldrich, Circuit Judge, adjudging the annulment of the assignment on the following findings of fact and of law: "I find as a matter of fact that at the time the conveyance of interest or release of Miss Mary S. Lawrence to Mrs. E. Charlotte Lawrence, on the third day of November, 1899, was made, two pregnant statements were made to her calculated to influence her to part with her interest in the estate of her deceased brother, Dr. Joseph S. Lawrence, for a trifle or for very slight consideration: First, that her brother died leaving a will under which she took nothing; secondly, that even if there was no will, his estate was insolvent and she would get nothing in that event as well. That both of these statements were misrepresentations; third, that at the time of this transaction the defendant, Mrs. E.

Charlotte Lawrence, who was making the deal through her attorney and agent, was administratrix of her husband's estate and as such was trustee for the creditors and the heirs, and Miss Lawrence was her *cestui qui trust,* and that the transaction was in violation of the fiduciary relation existing between them. As a matter of law, that the said conveyance or release thus procured was fraudulent, null and void."

Mrs. Lawrence appealed from this decree, assigning errors of both law and fact in the foregoing findings of the Circuit Court. While the cause was pending on appeal in this Court, Mrs. Lawrence, against the protest of Mr. Gadsden and contrary to the advice of counsel who had represented her in the litigation, through other attorneys substituted on the record as her counsel, compromised the suit by the payment of the sum of $95,000 to the plaintiffs. An order was then made by this Court on the consent of the attorneys for the plaintiffs, and the substituted attorneys of Mrs. Lawrence, dismissing the appeal. If the appeal had been sustained, the plaintiffs would have recovered nothing, and if they had been successful the property recovered would have been worth to them about $192,000. Miss Lawrence received only $500 in connection with the assignment, but the contention of the defendants was that this was a gift, and that the real consideration was her generosity combined with her conviction of duty induced by Mr. Gadsden's statement that there was a last will by which her brother had left all his property to his wife and stepchildren.

After the consent order had been taken for the abandonment of the appeal, Mr. Gadsden filed his petition in this Court, in which, after setting out the history of the litigation between Mrs. Lawrence and the administrator of the estate of Miss Lawrence and her heirs, he alleged: "That if the opportunity for an appeal to and a review by this Court be otherwise denied to the petitioner the judgment and decree of the Circuit Judge will constitute and remain a

permanent and final record and decision disastrously reflecting upon the professional character of the petitioner. That as petitioner is informed and believes he has no other adequate remedy or means of redress except by appeal to this Honorable Court, and while, as aforesaid, petitioner has no pecuniary interest at stake, the petitioner has that at stake which is of more value than pecuniary interest, namely; his good character as an attorney at law and an officer of the Courts of South Carolina."

The prayer of the petition was: "Wherefore, petitioner prays that this Court will retain the record sent up on appeal from the lower Court upon which the judgment and decree of the Circuit Judge are based, and will examine the same in so far as it relates to the actings and doings of this petitioner, and inasmuch as the dismissal of the said appeal will deprive the petitioner of the opportunity of having this Court examine the record in a trial upon the merits, the petitioner appeals, as an officer of the Court, to the jurisdiction of the Court for such protection as is due to an officer of the Court under such circumstances, and he asks that the Court will upon such examinaton of the record pronounce such judgment with respect to the petitioner as the record shall in the opinion of this Court demand."

Upon hearing the petition, this Court held that Mr. Gadsden, as an officer of the Court, had the right to an investigation of his conduct and a judgment thereon at the hands of the Court. The Attorney General was requested by the Court to appear as *amicus curiae* in the public interest. At the hearing, the petitioner submitted the entire record in the original cause, including all the evidence, as his vindication. The only additional evidence offered was the testimony of Mr. Holman, one of the attorneys for the administratrix and heirs of Miss Mary Lawrence, as to the terms of settlement of the original cause made by Mrs. Lawrence. After consideration of the evidence in the light of the able

arguments presented in the cause, the Court now gives its judgment on the conduct of Mr. Gadsden.

The first and most important question is: Did Mr. Gadsden intentionally misrepresent the value of the estate of Dr. Lawrence or any other matter in his interview with Miss Lawrence which resulted in the execution of the assignment? The only persons now living who were present at the interview are Mrs. Tarver, one of the plaintiffs, and Mr. Gadsden himself. According to Mrs. Tarver's testimony, Mr. Gadsden told Miss Lawrence in his interview with her that the estate was so indebted that Miss Lawrence would not receive from it as much as the $500 which he was offering for her interest. She testified further: "Mr. Gadsden and I got in a little dispute about her signing the paper; I was not willing for her to sign it, and we argued quite a while, and he then asked me to read the paper, and I told him I was not a lawyer and could not unravel it. He then read it to me, and when I objected so bitterly to her signing it he then told me it was only to allow Mrs. E. Charlotte Lawrence to, I would say, manage the property of Mr. Joe Lawrence, and then he stated to us that if there was any will or any proviso made to her, that this paper would not interfere with it in the least."

Mr. Gadsden testified that he carried with him $1,000 received from Mrs. Lawrence, believing that to be a fair price to pay for Miss Lawrence's interest. He thus states his representations to Miss Lawrence. "I went to Halcyondale, arriving there in the morning, and was directed to the Tarver house; went up to the house, and inquired for Miss Mary Lawrence; I was asked in, and Miss Lawrence came to meet me. I introduced myself to her by name, told her I had come to see her with reference to her brother's estate, and told her of her brother's death. I told her of the fact of his illness, of his having been abroad, of his death at Capon Springs. I told her of the letter which he had written to Dr. Buist, stating that, he had left a will, and also in

that letter where he had determined he wanted to be buried, and I told her of the conversation that Dr. Buist had related to me between the doctor and himself, as to his having left his property to his wife and children. I told her practically what I have testified here, as to what I had done to try and find the will, the various efforts I had instituted and the fact that up to date I had been unsuccessful. I told her of this key that I had, and told her that I felt satisfied that there was a will, but I could not find or had been unable to find it up to that time. I then went on to tell her about her brother's estate, and told her that the doctor, so far as I knew, had left $10,000 in bonds, about $16,000 or $17,000 in cash and something over 9,000 shares of Consolidated stock. I did not state 9,200, but something over 9,000 shares. The stock, I told her, in my judgment, had no value. I also told her that a large number of claims had been put in against her brother's estate, and that those claims were coming in every week or so, and that in my judgment the estate had little value. I mentioned some of the claims by name to her. About this point of the interview Miss Lawrence said to me that she felt satisfied that if her brother Joe had left anything, that he wanted it and intended it to go to his wife and children and that he did not intend to give it to her; that she felt satisfied from what I said that he left a will, and that she hoped the will would be found, and that she certainly did not propose to take advantage of the accident of the loss of the will to claim any part of his estate; that she would feel as if she were taking something she was not entitled to. I had explained to Miss Lawrence that in the absence of a will, under our law, she, being a half sister, was entitled to fifty per cent. of the estate. I said that if she felt that way, that in order to carry out the views that she had it would be necessary that she sign a release or assignment of her interest to Mrs. Lawrence, which she said she would very readily do."

He furthered testified that Miss Lawrence signed the paper solely through her desire to carry out what she thought were her brother's wishes with respect to the property as expressed by his will, and that the payment of $500 was not mentioned until after the transaction had been concluded, when he offered the money on behalf of Mrs. Lawrence in recognition of Miss Lawrence's magnanimous action; that Miss Lawrence at first refused to accept it, but later did so upon Mrs. Tarver's earnest solicitation. He denied the representation imputed to him by Mrs. Tarver that the paper would have no effect beyond allowing Mrs. Lawrence to manage the estate, but admitted the statement that if a will should be found the assignment would not defeat any provision for Miss Lawrence.

The complaint itself sustains Mr. Gadsden's version of the representations made by him; for it is therein alleged that the untrue statement made to Miss Lawrence was that the estate of her brother was of "small value," not that it was of no value; and there is in the complaint no allegation of misrepresentation as to the nature and effect of the paper. In this hotly contested litigation, with so great pecuniary interests involved, it seems certain that if such untrue representations had been made, they would have been alleged in the amended complaint. The legal opinion that the discovery of a will, containing a provision for Miss Lawrence, would have made the assignment of no effect, though incorrect, cannot be fairly regarded as intentionally false.

The evidence tends to the inference that the conviction expressed by Mr. Gadsden that Dr. Lawrence had made a will leaving all his property to his wife and stepchildren had strong support in the facts ascertained by him, and was sincere. George B. Edwards testified that Dr. Lawrence, just before leaving Charleston in the spring of 1899, told him he had made a will in order to protect his wife and stepchildren. Dr. Lawrence wrote his friend Dr. Buist from Italy in April, 1899, referring to his will; and Dr.

Buist testified that in the summer of the same year Dr.
Lawrence, while at Capon Springs, suffering from his last
illness, told him he had made a will appointing Dr. Buist
executor, and leaving all his property to his wife and step-
children.    All this was communicated to Mr. Gadsden and
was calculated to induce a belief that Dr. Lawrence intended
his wife and stepchildren to have his property, and that he
had left a will carrying his intention into effect.    It is true
that Mr. Gadsden knew that the most diligent search for
a will had been made without success; but in a letter dated
November 10, 1899, Miss Lawrence wrote to Mrs. Law-
rence, "I trust the will which Joe made will be found and
everything will be cleared up," thus confirming Mr. Gads-
den's statement that he had told her the will could not be
found.    The finding of the Circuit Court that Mr. Gads-
den's statements as to the will were misrepresentations, if
the finding meant that they were known to be untrue, is, we
think, contrary to the evidence.

   We next inquire into the finding of the Circuit Judge that
Mr. Gadsden represented the estate to be of no value when
in fact it was of great value.    The real representation, as
we have seen, was the expression of the opinion that the
estate would be of little value after the payment of debts,
not that it would be of no value.    Mr. Gadsden testified
that he mentioned the items of property of which the estate
consisted, and there is no testimony to the contrary.    These
items were $19,803.57 in cash, $10,000 in bonds and 9,200
shares of stock of Charleston Consolidated Railway, Gas
& Electric Company, of the par value of $50 per share.    In
the beginning of his evidence Mr Gadsden testified that he
represented the cash to be $16,000 or $17,000, but he after-
wards testified that he had refreshed his memory and that
he knew that he had stated to Miss Lawrence the true
amount of the cash from memoranda in his possession at
the time.    The bonds, admitted to be worth at the time

about $9,000, with the cash of $19,803.57, made up a known value of $29,803.57.

The representation by Mr. Gadsden that in his opinion the 9,200 shares of stock were of no value requires particular attention. Dr. Lawrence came to Charleston as a promoter in 1896 and after much effort succeeded, in 1899, in bringing about a consolidation of the street car lines and certain other public service corporations under the name of the Charleston Consolidated Railway, Gas & Electric Company. The new company issued mortgage bonds to the amount of two and one-half million dollars, using the proceeds to acquire the property of other corporations. Its stock issue of 30,000 shares, of the par value of $50 per share, was to some extent given in exchange for the stock of the merged corporations, but in the main it was issued as promotion fees to the parties interested. The evidence leads to the inference that the 9,200 shares held by Dr. Lawrence were received as compensation for his services as promoter.

There is no evidence whatever that at the date of the consolidation, or at any time prior to the assignment by Miss Lawrence, the franchises and other property of the consolidated company could have been sold for more than the amount of the mortgage debt. It is no doubt true that the promoters of the scheme hoped that the stock would become valuable, but the evidence from business men apparently disinterested is conclusive that when Mr. Gadsden's representations were made to Miss Lawrence the stock could not have been sold or used as collateral. In the year 1900 the company would have defaulted in the payment of the interest on its bonds, had not S. H. Wilson, one of the parties interested, borrowed for it $60,000 on his personal credit. This state of depression continued until the launching of the exposition in Charleston in 1901. A dividend was not declared until 1903 and that was only one-half of one per cent. The first sale of the stock was in 1903 at $4 per

share. After that time the stock steadily increased in value and was worth on the market at the time of the trial about $30 per share. In view of this summary of the evidence as to the speculative character of the scheme which was the origin and basis of the stock, and as to the estimation in which it was held by the investing public, it seems clear that a business man might have held and expressed the opinion in 1899 with entire sincerity that stock of the consolidated company was of no value. The fact mainly relied on to show that the opinion Mr. Gadsden expressed was not sincere is the prosperity of the company, which came afterwards, due to the exposition, the construction of the navy yard and the extraordinary increase in general prosperity. We do not think this evidence warrants the inference of intentional misrepresentation of the value of the stock.

As to the charge of misrepresentation of the amount of the debts, little need be said. Dr. Lawrence was no exception to the rule that men engaged in speculative enterprises usually leave their affairs in a state of complication. The claims presented to the administratrix aggregated more than the cash and the value of the bonds. Even allowing that Mr. Gadsden expected successful resistance to some of the claims, still the record indicates that there was reason to apprehend that if the stock was worthless the debts would absorb far the larger part of the cash and the value of the bonds, and leave the estate of little value. After litigation and compromise the net amount paid in satisfaction of debts was about $18,000.

In considering the conclusion to be drawn from these conditions, it is to be borne in mind that the law forbids that any person should participate officially as an attorney in the administration of justice until he has furnished satisfactory proof of good character. The presumption is therefore in favor of the integrity of the bar; and on the great issue of the honesty or depravity of an attorney the rule of authority and reason is that the Court should require the

charge of depravity to be established by the clear preponderance of the evidence. *In re* Evans (Utah), 62 Pac. 913; 53 L. R. A. 952; *In re* Newby (Neb.), 117 N. W. 691; *People* v. *Matthews* (Ill.), 75 N. E. 444; 4 Cyc. 915; *Ex parte* Wall, 107 U. S. 265, 27 L. Ed. 552; *In re* O— (Wis.), 42 N. W. 221; *In re* Eaton (N. D.), 62 N. W. 597. The charge of falsehood is not established by mere proof that the statement made was untrue, when the evidence shows that there was reasonable ground for believing it to be true.

On consideration of the entire evidence and the rules of law applicable thereto, we reach the conclusion that Mr. Gadsden must be acquitted of intentional misrepresentation of the facts or of his own opinions in his interview with Miss Lawrence.

Nevertheless, Mr. Gadsden's conduct was by no means free from fault. His offense was in the act itself of taking from Miss Lawrence the assignment which he knew she was induced to make by his representations. His client, Mrs. Lawrence, as administratrix of the estate of her husband, was trustee for Miss Lawrence as a distributee entitled to one-half of the estate, and was charged with the duty of protecting her interests in the estate. Mr. Gadsden, having accepted the responsibility of guiding the administratrix in the discharge of her trust, stood in the same fiduciary relation to Miss Lawrence. He is a man of unusual intelligence who had been at the bar for ten years, and must have known of the obligation of a trustee not to acquire a personal advantage at the expense of a *cestui que trust*. He must have known also the repugnance with which not only the Courts but all fair men regard conveyances or transactions obtained by a trustee from a beneficiary of the trust.

Judicial distrust of such transactions runs through the whole history of jurisprudence and has been expressed with emphasis in a number of cases in this State. The general rule against the validity of such transactions does not depend

on a presumption that there was actual fraud or intentional wrong, but on the principle that the trust relation places such obligations on the trustee that he should not occupy that position of opposition to his *cestui que trust* which trading with him denotes, and on the presumption that the trustee by reason of his superior knowledge of the trust estate occupies such a vantage ground that the parties do not deal on equal terms. There are, it is true, exceptions to the rule, and such transactions may be sustained when there is clear affirmative proof of a fair consideration, perfect candor, and of the absence of advantage of superior information; in other words, when the *cestui que trust* deals on equal terms and is fully advised of what he is doing and the effect of his act. The absence of full information and independent advice is always regarded a strong circumstance against the validity of the transaction. Among the many authorities on the subject we cite the following: *Butler* v. *Haskell,* 4 Des. Ch. 698; *McCants* v. *Bee,* 1 McC. Ch. 383; *Parris* v. *Cobb,* 5 Rich. Eq. 450; *Way* v. *Union C. L. Ins. Co.,* 61 S. C. 501, 39 S. E. 742; *Scottish Am. M. Co.* v. *Clowney,* 70 S. C. 229, 49 S. E. 569; *Tindall* v. *Sublett,* 82 S. C. 199, 63 S. E. 960, 22 L. R. A. (N. S.) 435n; Perry on Trusts, sec. 194 *et seq.*

These rules of law are founded on obvious ethical obligations and they were violated by Mr. Gadsden under circumstances which subject him to censure. The inequality of the parties could hardly have been greater, and was perfectly apparent. Miss Lawrence was a gentle old woman who had always lived in the complete retirement of a somewhat obscure home life, without business associations or experience and with little knowledge of the world outside of her own narrow environment. The evidence does not lead to the conclusion that she was mentally deficient in the sense of being below the average intelligence of persons of her opportunity and experience; but it establishes beyond doubt that she was evidently without capacity to comprehend

a complex business affair, or to co-ordinate the facts and estimate the value of bonds and stocks, or to weigh the evidence as to the alleged will, or to reach unaided a correct conviction as to her own rights and obligations. On all these matters Mr. Gadsden could not fail to know that she relied entirely on his representations and his opinions.

Assuming the utmost good faith in his representations and opinions, yet it is impossible to doubt that Mr. Gadsden as a lawyer and a man of affairs, who had fully considered all the facts in his possession, must have been conscious that there was information which might lead other reasonable persons to conclusions different from his own. The fact that the will had not been found after diligent search afforded ground for an inference that Dr. Lawrence had destroyed it. The fact that the stock in the consolidated company had been acquired by much pains and labor with the expectation of profit from it, and that the business had been launched but a few months, afforded ground for a competent adviser of Miss Lawrence to caution her against regarding the stock valueless until the corporate scheme had been fully tried. We cannot doubt that the incapacity of Miss Lawrence to see the bearings of these facts on her legal rights and her moral obligations must have been evident to Mr. Gadsden. It certainly was evident to him that full acceptance of his opinion that her brother had died leaving a will in force expressing his desire that all his property should go to his wife and her children induced the guileless old lady to believe it was her duty to relinquish her interest in the estate. It is impossible to resist the conclusion that these considerations, so obvious and so convincing of the impropriety of taking the assignment, ought to have deterred Mr. Gadsden from entering into the transaction.

Besides, he had a strong reminder of his duty. Mrs. Tarver, the niece of Miss Lawrence, when called in to witness the paper, according to her testimony earnestly protested against the proposed transaction; according to Mr.

Gadsden's testimony the protest was not directed to him, but to Miss Lawrence. The difference is immaterial. It placed Mr. Gadsden in the position of accepting an assignment of her property offered by an untutored woman under a sudden conviction of duty induced by his expression of opinion, against the solicitous advice and protest of her closest friend. The conclusion is inevitable that the transaction was invalid and the conduct of Mr. Gadsden with respect to it reprehensible.

This Court would refuse, however, to inflict for such degree of misconduct the extreme penalty of disbarment or suspension from his office as an attorney at law, so humiliating and disastrous, even if it were within its discretion to impose such a penalty, because of two facts, which taken together are of great importance. These facts are: First, the evidence does not prove intentional misrepresentation of facts or of opinion in the interview between Mr. Gadsden and Miss Lawrence; second, the breach of duty grew out of excess of zeal for the interests of a client and not in pursuit of his own interests. The second fact is of importance when taken in connection with the first.

The general power of Courts in respect to the imposition of penalties on attorneys for misconduct is thus stated by that great jurist, Mr. Justice Bradley, in delivering the opinion of the Court in *Ex parte* Wall, *supra:* "It is laid down in all the books in which the subject is treated, that a Court has power to exercise a summary jurisdiction over its attorneys to compel them to act honestly towards their clients, and to punish them by fine and imprisonment for misconduct and contempts, and in gross cases of misconduct to strike their names from the roll." The severe punishment of disbarment or suspension should not be inflicted when the less punishment of reprimand or fine would accomplish the purpose. *Bradley* v. *Fisher,* 80 U. S. 335, 20 L. Ed. 646.

Section 2816 of the Civil Code provides that an attorney "may be removed or suspended who shall be guilty of any

deceit, malpractice or misdemeanor." The statute does not express any intention to take away or limit the common law power of Courts to disbar or suspend for gross misconduct not falling within the terms of the statute, nor does it purport to affect the common law power of Courts to inflict a less punishment for misconduct not grave enough to warrant the penalty of suspension or disbarment. In the absence of such express restriction the inherent common law power of the Courts in these respects remains. *Boston Bar Asso.* v. *Greenhood* (Mass.), 46 N. E. 568; *In re* Smith (Kan.), 85 Pac. 584; *In re* Mills, 1 Mich. 392; *Commonwealth* v. *Roe* (Ky.), 112 S. W. 683; 114 Am. St. Rep., note, p. 740; 4 Cyc. 906; Weeks on Attorneys at Law 155. We express no opinion as to the power of the legislative department to control the Courts in this respect, as the attempt to exercise such power has not been made.

Under the rule laid down in Duncan's case, 64 S. C. 461, 42 S. E. 433, an attorney should not be disbarred or suspended in a case like this, involving fairness in a business transaction, unless the evidence leads the Court to the clear conviction that the misconduct was due to a bad or fraudulent motive—that it was so gross as to show a want of integrity. As we have endeavored to demonstrate, the evidence does not produce a clear conviction of moral fraud, and the Court will not inflict the penalty of suspension or disbarment.

Some less penalty must be imposed. The mere expression of the opinion of this Court that a member of the bar in even a single instance has fallen below the ethical standards of the profession is in itself a serious penalty, and we think none greater should be inflicted in this instance.