HAMER v. DAVID *ET AL.*

(136 S. E., 744)

1. TRUSTS—BENEFICIARY OF TRUST, BY SUBSEQUENT RATIFICATION AND DELAY IN BRINGING ACTION, HELD BARRED FROM CLAIMING ASSIGNMENT OF INTEREST WAS FRAUDULENTLY PROCURED.—Where beneficiary of trust, after assigning interest therein, subsequently ratifying it by receiving yearly benefits thereunder, and delaying bringing any action thereon for more than 5 years, he is barred from asserting claim that assignment was fraudulently procured.

Order on Petition for Rehearing

2. TRUSTS—BENEFICIARY MAY NOT RECOVER PAYMENT MADE FOR RE-
   CONVEYANCE OF INTEREST PREVIOUSLY ASSIGNED, WHERE ORIGINAL
   ASSIGNMENT WAS BINDING ON HIM BECAUSE OF LACHES.—Where orig-
   inal transaction, whereby beneficiary of trust assigned interest there-
   under was valid, beneficiary was not entitled to recover amount
   subsequently paid assignee for reconveyance of such interest, al-
   though assignee, by his conduct in reconveying for an inadequate
   sum,‛ established his improper conduct in connection with original
   assignment. ·

Before DENNIS, J., Dillon, Spring Term, 1924.    Decree
modified.

Action by W. M. Hamer against Dr. J. H. David,
wherein E. T. Elliott and others, as substitute trustees, and
W. M. Rising were subsequently made parties. From the
decree, plaintiff W. M. Rising and the trustees appeal.

The decree of Circuit Judge E. C. Dennis is as follows:

"This action started out in 1916 between the above
parties for the collection of 15 bales of rent cotton. The
case at the first trial resulted in a verdict and judgment for
the defendant, and, on appeal to the Supreme Court, this
judgment was reversed, as reported in 112 S. C., 211. After
this decision the trustees of the estate of H. P. Price were
made parties, and later on W. M. Rising, the beneficiary
under the trust estate, was also made a party. After all of
these parties had been brought in, the case was referred to
me as a special referee to hear and determine all questions of
law and fact. I went to Dillon and held a reference, at which
time a good deal of testimony was taken. The question then
arising as to whether or not W. M. Rising could amend his
pleadings, an appeal was taken again to the Supreme Court,
and it was decided that Rising could amend his pleadings,
and he proceeded to do so. By the time the case was ready
to proceed with the taking of testimony, I had been elected
judge, and it was agreed that the testimony should be
taken and the case submitted to me for determination. One
H. P. Price died a good many years ago, leaving a large

estate in the hands of trustees for the benefit of Wilbur M. Rising. Rising seemed to be unfortunate in his business arrangements, and became heavily involved, and seems to have felt that his estate was not being managed by the trustees for the best interest, and thereupon sold his beneficiary interest in the estate to the plaintiff W. M. Hamer, by a written instrument, which is in evidence.

"At the time Hamer became the owner of this interest, the defendant, J. H. David, was the lessee of a tract of land belonging to the estate. This lease of David's being about to expire in the year 1913, he desired to renew the lease and entered into negotiations with the trustees. David had been paying 50 bales of cotton per year rent, but that did not include all of the plantations. Hamer, being the beneficiary, authorized a 10-year lease to David, by which he was to pay the trustees a rental of 60 bales per annum, and took a separate agreement from David, by which David was to pay to Hamer for a period of 10 years 15 bales of cotton each year, making the total rent 75 bales, though only 60 bales passed through the hands of the trustees. This 15-bale contract was kept secret as between David and Hamer, and David paid Hamer the 15 bales of cotton each year for 2 years, but in 1916 refused to pay to Hamer the 15 bales, and this action was brought. The trustees by their answer set out that the contract for the 15 bales was unknown to them, and set up their right to have this cotton to go through their hands as a part of the trust estate.

"W. M. Rising, by his pleadings, undertook first to have his agreement with Hamer as to the 15 bales of cotton set aside as a fraud and later raised the questions by his pleadings that the whole transaction as between him and Hamer was fraudulent. He alleges that, at the time he conveyed his interests in the trust estate to Hamer, he was incapable of attending to business, and that Hamer took advantage of him by fraud and overreaching, and prayed that Hamer be made

to account for all that he had received from the trustee under the contract by which Rising assigned to Hamer his interest in the trust estate. Rising also raised the issues that one of the trustees, now dead, W. T. Bethea, also was guilty of fraud in that he colluded with W. M. Hamer to receive benefits from the Hamer contract. This brought about a great may questions of law and fact, and makes this a very long and cumbersome record.

"As said above, I held a reference, and at this reference W. M. Rising and his wife both testified, and I was not impressed by their testimony at all. Counsel representing Rising seems to think him little more than an idiot when it comes to business matters. Rising impressed me as shrewd enough as to testify very explicitly to things which were beneficial to him, and denied everything that anybody else testified to against him. A part of his testimony was absolutely contradicted by T. I. Rogers, an attorney in this case, and I do not hesitate to accept the testimony of Mr. Rogers and to reject the testimony of Rising and his wife.

"In this connection, I find that the trustees of this estate made the most complete, accurate, and detailed statement of their acts from the time Mr. J. B. Gibson became one of the trustees up to the time that he resigned that I have ever seen. The report of the trustees accounts most accurately and fairly for all moneys coming into their hands, and was a most creditable showing, and they cannot be censured in any way for their acts in this matter, but should be commended.

"There is an attempt to discredit W. T. Bethea, but he is dead, unable to explain his connection in any of the matters, and I do not think that the evidence would warrant holding W. T. Bethea's estate for any amount, or casting any reflection upon his name, which had always been an honored name in Dillon county, he having always stood for what was right and fair.

"In 1915 Hamer reconveyed to Rising his interest in the Price estate, but the reconveyance is so worded as to be understood by Hamer not to include the 15-bale contract, which he had with David, but about which the trustees had no knowledge. This language is capable of the construction Hamer puts on it, and the proof shows that Rising was told that Hamer was not including the 15-bale contract under the reassignment. I have concluded that, when Rising paid Hamer and obtained the assignment back to himself, Hamer should have transferred all of the estate; as he was no longer the beneficiary it would be unfair for Hamer to receive rent from year to year for a long period of time after he had no longer any interest in the estate. In the first place, I do not think that it was proper for Hamer to take a secret agreement, and I certainly do not think the Court should allow him to reap the benefits after his right has been questioned. The reassignment was to go into effect June 1, 1915, according to the agreement, but Rising let Hamer collect the 15 bales that year without protest or objection, and therefore I find that Hamer should retain the 2 years' rent collected by him—that is to say, for 1914 and 1915—but that he should pay to the executors their commissions of the same. I find that Hamer should not receive any other rents or income from the estate, and that the rent collected for the year 1916 and all subsequent years should be a part of the estate in the hands of the trustees, and should be disbursed by them under the terms of the trust. With reference to the original transaction between Hamer and Rising in 1910 and all that was done thereunder until Hamer reconveyed to Rising, I find should be sustained. These transactions were known to Rising, and he not only acquiesced in them, but gave his written approval on numerous occasions. It was only after Hamer and David got into this lawsuit that Rising took any action. I think Rising has sense enough to be responsible for what he did, and there-

fore I do not see any sufficient reason to upset what was done prior to the reassignment by Hamer to Rising.

"The attorney for Rising, Mr. Joe P. Lane, has done a great amount of work, and has rendered most faithful and capable services in this matter, and his fees should be paid by the trustees. In the event that they cannot agree on this fee, the matter is to be referred to the master for him to report to me. The matter of costs which have occurred since the first appeal to the Supreme Court should be paid by the parties themselves; that is to say, with the exceptions of the costs of the second appeal the trustees should pay their costs, and W. M. Hamer should pay his costs, except the costs of the referee and the cost of taking the testimony, which should be paid one-half by Hamer and one-half by the trustees of the estate."

*Messrs. T. I. Rogers* and *W. M. Stevenson,* for appellant Hamer, cite: *No appeal lies from question not passed on:* 93 S. C., 121; 89 S. C., 395; 87 S. C., 18; 18 S. C., 288. *An appeal from finding as to an account must specify items to which objection made:* 86 S. C., 526. *Testimony as to transaction with party deceased:* Code Civ. Pro., 1922, Sec. 708. *Party having full knowledge of facts cannot maintain action for fraud:* 107 S. C., 202; 101 S. C., 221.

*Messrs. Joe P. Lane* and *W. P. Moore,* for W. M. Rising and present trustees, cite: *Former appeals:* 124 S. C., 391; 117 S. E., 807; 112 S. C., 211. *Gross inadequacy of consideration in contract with moron is evidence of fraud:* 94 S. C., 386; 61 S. C., 505; 4 DeS. Eq., 650; 12 R. C. L., 85, 428, 440 and 443; 9 Cyc., 463. *Agreement between trustee and party dealing with beneficiary strictly scrutinized:* 112 S. C., 214; 35 S. C., 430; 29 S. C., 285; 24 S. C., 179; 6 S. C., 150; 5 S. C., 391; 11 McC. Eq., 143; 1 McC. Eq., 383; 4 DeS. Eq., 650; 1 Strob. Eq., 382; 45 Sup. Ct. Rep., 451; 26 R. C. L., 1329; 25 Cyc., 1161 and 1165; 39 Cyc., 528, 548, and 559. *Testimony as to transaction with*

*party deceased:* Code Civ. Pro., Sec. 708. *Where evidence tends to show conspiracy Court will allow testimony concerning whole transaction:* 32 S. E., 345; 71 A. S. R., 262; 1 R. C. L., 521; 5 R. C. L., 1088. *Hamer a trustee:* 112 S. C., 211. *Caution to produce appearance of fairness arouses suspicion:* 12 R. C. L., 441. *Trustee not allowed to participate in profits in transaction by third party with cestui que trust:* 112 S. C., 211; 89 S. C., 363; 35 S. C., 430; 29 S. C., 285; 24 S. C., 179; 6 S. C., 158; 5 S. C., 391; 1 S. C., 398; 1 Strob. Eq., 382; 2 McC. Eq., 143; 4 DeS. Eq., 650; 25 Cyc., 1161–1165; 39 Cyc., 172, 182, 298, 525; 27 C. J., 11 and 13; 6 R. C. L., 719; 12 R. C. L., 232 and 236; 26 R. C. L., 83, 1237, 1325 and 1329. *Trustee cannot rely on Statute of Limitations against his cestui:* 36 S. C., 327; 35 S. C., 430; 7 Rich. Eq., 105; Spears Eq., 303; 9 Cyc., 470; 25 Cyc., 1161 and 1165. *Burden of showing that party defrauded had notice of fraud more than statutory period before action:* 119 S. E., 800; 93 S. C., 405; 77 S. C., 541; 47 S. C., 133; 33 S. C., 36; *Ratification of fraudulent contract not binding in absence of knowledge of fraud:* 4 DeS. Eq., 650; 27 C. J., 22; 12 R. C. L., 410; 26 R. C. L., 1347, 1351 and 1330. *Any settlement with defrauded beneficiary closely scrutinized:* 89 S. C., 353; 45 Sup. Ct. Rep., 451; 26 R. C. L., 1237, 1249, 1325, 1330, 1347 and 1351.

*Mr. N. B. Hargrove,* for respondent.

January 17, 1927.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

I do not entirely agree with Mr. Justice Purdy in his disposition of this case, and I trust, without disparagement of his very able opinion, I may be excused for presenting my views of this very complicated case, in my own way.

The action was originally brought by W. M. Hamer against Dr. J. H. David, upon an alleged lease of certain

lands of the estate of one H. P. Price, under these circumstances:

Price owned a considerable estate; his wife survived him; they had no children. He had recognized W. M. Rising, an illegitimate, as his son, and in his will he appointed, as executors and trustees, W. T. Bethea, J. B. Gibson, and W. D. B. Hayes, who were directed to pay the entire income. of the estate to his wife, during her life, and after her death the estate was to be still managed by the trustees, and the income paid to W. M. Rising, the illegitimate son, during his lifetime. Price died prior to the year 1910, and his wife did not long survive him. Rising then became entitled under the will to the entire income for life. On February 16, 1910, W. M. Hamer procured from Rising an assignment of his entire interest in the income payable to him under the will of Price, upon certain considerations. Prior to that time Dr. David had leased a certain portion of the estate from the executors, and in March, 1913, the lease was about to expire, and Dr. David desired to have it renewed. After a conference between the executors, W. M. Hamer, who claimed under the assignment the interest of Rising, and Dr. David, a lease was agreed to be given to Dr. David by the executors for a term of 10 years, at a yearly rental of 60 bales of cotton. The lease was executed, dated March 13, 1913. At the same time a "side agreement" was entered into between Hamer and Dr. David, by which Dr. David agreed to give Hamer personally 15 bales of cotton per annum in addition to the 60 bales rental due to the executors. This "side agreement" was purposely concealed by both Dr. David and Hamer, from the executors. For two years thereafter Dr. David delivered 60 bales per annum to the executors and 15 bales per annum to Hamer.

On February 27, 1915, in a written communication; Rising offered to pay Hamer $2,000 for a reconveyance of the

interest which Rising had conveyed to Hamer on February 16, 1910, which offer was accepted by Hamer in a written communication dated May 29, 1915, the transfer to become effective as of June 1, 1915. After the termination of Hamer's interest in the assignment by Rising of February 16, 1910, thus effected, Dr. David, while continuing to deliver the 60 bales rental to the executors, declined to deliver the 15 bales under his "side agreement" with Hamer; the default appearing to have begun with the delivery due in the fall of 1916. Thereupon Hamer instituted the original action against Dr. David for that delivery. The case was tried in March, 1917, before his Honor Judge Memminger and a jury, and resulted in a verdict for the defendant Dr. David. Upon appeal by Hamer, the judgment was reversed. 112 S. C., 211; 99 S. E., 816. This Court held:

"Mr. Hamer used his position as the beneficial owner of the life estate [meaning, I interpolate, the interest of Rising] to secure for himself a contract for 15 bales of cotton per year, for years after his estate might, and in fact did, terminate. Can he have the benefit of that contract, to the detriment of the estate after his interest terminated? The answer should be, he cannot. * * * The procuring of a 10-year term was a valuable consideration to support the 15-bale lease, but it inures to the benefit of the estate and cannot extend Mr. Hamer's interest. Mr. Hamer cannot have the benefit of it longer than his interest continued."

The Court also held that, as Dr. David was a party to the concealment and was not injured by the exaction of 15 bales extra by Hamer, he had no right to complain; that the executors had an interest in the 15-bale contract and should be made parties. The judgment in favor of Dr. David was accordingly reversed, and the executors ordered to be made parties. This opinion is dated July 19, 1919.

After the case had been remanded to the Circuit Court, the trustees were made parties; they at that time, by sub-

stitution, consisting of E. T. Elliott, J. B. Gibson, and J. Earle Bethea. W. M. Rising, the illegitimate, was also made a party. Two of the original trustees, Bethea and Hayes, having in the meantime died, Mrs. Georgia Bethea, executrix of the will of Bethea, and Miss Mary Hayes, executrix of the will of Hayes, were also made parties.

The defendant Rising in his original answer to the original complaint made this allegation:

"That some time thereafter (that is, after the death of Price) he conveyed for a consideration his right, title, and interest in and to the said rents, income, and profits, unto the said W. M. Hamer, who continued to hold the same until the year 1915, when same was reconveyed to this defendant."

He also alleged:

"That for some time prior to the 30th day of June, 1915 (June 1, 1915?), he had been negotiating with the said W. M. Hamer for a repurchase of his income and all of the right, title, and interest which grew out of the said estate for the benefit of the beneficiary under the terms of the said will; he at this time having no knowledge whatsoever of the contract between the said W. M. Hamer and J. H. David, but it being his intention to purchase all of the income therefrom, and on the 30th day of June, 1915 (June 1, 1915?), he and the said W. M. Hamer entered into a contract whereby, for and in consideration of the sum of $2,-000 to be paid by this defendant, the said W. M. Hamer conveyed all his right, title, and interest as beneficiary of the said estate, to this defendant"

—and called upon Hamer to account for the rents collected by him since the date of his reconveyance to Rising.

The trustees in their answer allege:

"That they admit that, at some time during the said lease (to Dr. David), the said W. M. Rising had sold out his beneficiary interest in the said estate, to the said W. M.

Hamer, and that during the year 1913 he was entitled under the said contract to the income therefrom. * * * They further allege that on the 30th day of June, 1915 (June 1, 1915?), the said W. M. Hamer reconveyed to their *cestui que* trust, W. M. Rising, all his right, title, and interest as beneficiary in said estate, and from the date of said conveyance the said W. M. Rising is entitled to receive all moneys paid as income accruing from said estate by way of rent or otherwise"

—and demand an accounting by Hamer for commissions on the rent collected in 1914 on the 15-bale contract, and the proceeds of the collection upon the same account made in 1915; that Dr. David should deliver to them the rents for 1916, 1917, 1918, and 1919, and for the remainder of the 10-year term for the benefit of W. M. Rising.

To the answer of the trustees, Dr. David made a reply, denying his accountability by reason of the 15-bale contract.

To the reply of Dr. David, W. M. Rising made a reply in which he alleges:

"That he further admits that he sold out for a consideration his interest in the estate to W. M. Hamer, but same has long since been repurchased by him, and he is entitled to and has been entitled to, since the repurchase thereof, all the rents and profits of the estate."

There are no dates to these pleadings, but it appears that they were served at some time between the date of the opinion in 112 S. C., 211, July 19, 1919, and the reference before Hon. E. C. Dennis, September 24, 1920, approximately 10 years after the contract of assignment from Rising to Hamer, February 16, 1910.

The case was then referred to Hon. E. C. Dennis, as special referee, before his election as Circuit Judge, by an order the date of which does not appear. He held a reference on September 24, 1920. At that reference this appears in the record:

"Attorneys for J. H. David state that they have no further contest in this matter as to the payment of the 15 bales of cotton, and admit that, under the decision of the Supreme Court, Dr. David is liable for the 15 bales of cotton to the executors."

The attorneys for Hamer admitted that the executors were entitled to commissions on the 15-bale contract for the entire term of 10 years for which the contract runs.

The trial then proceeded upon the issue whether the executors or Hamer were entitled to the proceeds of the 15-bale contract from June 1, 1915, the date of Hamer's reconveyance to Rising. Some testimony was taken at this reference, and it appears to have been adjourned, to be resumed "at a more convenient season." Later it appears that a motion was made by counsel for Rising for leave to serve an amended answer, before the special referee, who, in an order dated May 30, 1921, refused the motion. Upon exceptions to this order, heard by his Honor, Judge McIver, in August, 1921, the order was confirmed. Upon appeal to this Court, the order of Judge McIver was reversed, and the case remanded to the Circuit Court. May 8, 1923. 124 S. C., 391. The amended answer alleged fraud on the part of Hamer with reference to his purchase of the interest of Rising in the Price estate, the assignment and contract of February 16, 1910, fraud on the part of certain of the trustees, and demanded an accounting by the trustees and Hamer, alleging a conspiracy between them to defraud Rising. It further set up an alleged cause of action against Hamer to recover the $2,000 paid by Rising to him for the reconveyance of the beneficial interest, of date June 1, 1915, as having been obtained by fraud and overreaching, and an alleged cause of action under the 15-bale contract.

After the case had been remanded to the Circuit Court, the reference was resumed before Samuel McLaurin, Esq.; the former referee, Hon. E. C. Dennis, having been elected

Circuit Judge. A mass of evidence was taken before Mr. McLaurin, who made his report at some time in 1924 (the report is not dated), simply submitting the testimony as he had been directed to do.

The case was then heard by his Honor, Judge Dennis, who filed a decree dated September 13, 1924, holding that Hamer was entitled to retain the rents collected in the years 1914 and 1915 under the 15-bale contract; that he should account to the trustees for commissions upon the proceeds of this rent cotton, but "I find that Hamer should not receive any other rents or income from the estate, and that the rent collected for the year 1916, and all subsequent years, should be a part of the estate in the hands of the trustees, and should be disbursed by them under the terms of the trust."

In reference to the attack made by Rising upon the original assignment of his interest to Hamer, of February 16, 1910, he refused to sustain the contention of counsel for Rising that the latter was "little more than an idiot when it comes to busines matters." He held:

"Rising impressed me as shrewd enough as to testify very explicitly to things which were beneficial to him, and denied everything that anybody else testified against him" —and concluded by saying:

"With reference to the original transaction between Hamer and Rising in 1910, and all that was done thereunder until Hamer reconveyed to Rising, I find that (it) should be sustained. These transactions were known to Rising, and he not only acquiesced in them but gave his written approval on numerous occasions. It was only after Hamer and David got into this lawsuit, that Rising took any action. I think Rising has sense enough to be responsible for what he did, and therefore I do not see any sufficient reason to upset what was done prior to the reassignment by Hamer to Rising."

33—S. C.—138

In reference to the charge of fraud upon W. T. Bethea, one of the trustees, the Circuit Judge held:

"There is an attempt to discredit W. T. Bethea, but he is dead, unable to explain his connection in any of the matters, and I do not think that the evidence would warrant holding W. T. Bethea's estate for any amount, or casting any reflection upon his name, which had always been an honored name in Dillon County; he having always stood for what was right and fair."

From this decree both Hamer and Rising and the present trustees have appealed.

The exceptions of Hamer assign error in holding:

"That Hamer should not receive any other rents or income from the estate, and that the rent collected for the year 1916 and all subsequent years should be a part of the estate in the hands of the trustees, and should be disbursed by them under the terms of the trust."

The exceptions jointly of Rising and the present trustees raise substantially the following questions:

(1) The validity of the assignment and contract of February 16, 1910, by which Rising purported to assign to Hamer his entire right, title, and interest in the income from the estate in the hands of the trustees under the will of Hugh P. Price and Hamer purported to assume certain obligations to Rising.

(2) The validity and effect of the assignment and contract of March 2, 1910, by which Hamer purported to assign to W. T. Bethea, one-half interest on the profits derived from the original assignment and contract between Hamer and Rising, dated February 16, 1910.

(3) The validity and effect of what has been referred to as the 15-bale contract, between Hamer and Dr. David, dated May 13, 1913.

(4) The validity and effect of the contract, of reassignment between Hamer and Rising, effective June 1, 1915,

whereby Hamer reconveyed to Rising the interest which Rising had conveyed to Hamer by the original contract and assignment, dated February 16, 1910.

(5) The validity and effect of a letter from Hamer to Gibson, one of the trustees, dated July 28, 1915, directing him to divide equally between Hamer and Rising "all cash collected as specific income for 1915, beginning June 1st. * * * This to continue until otherwise notified in writing by me." At the foot of this letter appears what purports to be Rising's consent thereto.

The principal issue in the case is the attack made by the trustees and Rising upon the original contract and assignment of February 16, 1910. They allege, in substance, that at the time of the death of Price, and during the subsequent transactions between Hamer and Rising, the latter was an ignorant man, of limited mental capacity, and weak will, poor business judgment, inexperienced in business transactions, an habitual drunkard, and, in consequence, of impaired capacity for handling business; that Hamer was a man of strong will, of high mental capacity and business judgments, and pretensively a warm friend of Rising, who trusted him as such; that, prior to the execution of the said contract, Rising by the adroit suggestions of Hamer was led to believe that the trustees were not fairly accounting to him for the income from the estate to which he was entitled, and were imposing upon his ignorance and incapacity; that, at the time of the execution of the contract, he had been on an extended spree and was drinking heavily; that Hamer, taking advantage of his condition and of the trust reposed in him as his friend, with intent to cheat, swindle, and defraud him, induced him to execute the assignment and contract without any valid consideration.

I agree with the conclusions reached by Mr. Justice Purdy as to the mental capacity of Rising, his relations with Hamer, and the advantage taken of him by Hamer in the transaction.

The evidence shows that during the period in which Hamer held the assignment, February 16, 1910, to June 1, 1915, Hamer realized profits, after complying with his obligation to pay Rising $24 per annum, to the extent of $6,919.42. It shows also that on March 2, 1910, Hamer assigned one-half interest in the assignment to W. T. Bethea, one of the trustees, the consideration stated being "$5 and services to be performed in making all collections and looking after property * * * and assigns to me (Hamer) one-half interest in an insurance policy with the South Atlantic Life Insurance Company on the life of said Wilbur M. Rising."

It shows also that on July 28, 1915, less than two months after Hamer had reconveyed to Rising the interest assigned to him by Rising in the contract of February 16, 1910, Hamer induced Rising, without any consideration whatever, to consent to an order upon the trustees to pay to him (Hamer) one-half of "all cash collected as specific income for 1915, beginning June 1, 1915, * * * this to continue until otherwise notified in writing by me."

There does not appear any reason for the assignment by Hamer to Bethea of one-half interest in the contract of February 16, 1910. The stated consideration that Bethea should perform for Hamer services in making collections and looking after the property is unsatisfactory, as his position already required these duties of him. That Bethea had misgivings as to his participation in the matter is shown by his letter to Hamer, dated June 23, 1913, in which he says:

"Don't you think it would be better for you to make some kind of settlement with him (Fass, a judgment creditor of Rising), rather than have the whole thing aired in Court?"

To this Hamer replied quite sharply, that he did not understand what Bethea meant by "aired in Court"; that "I have never yet had a business transaction that I objected

to be 'aired' before any tribunal; you once wrote me that you thought best for you not to participate in the profits, but the tempter evidently got hold of you later and changed your heart." From which the inference is plain that Hamer carried out the terms of his assignment to Bethea. On October 20, 1913, Bethea reassigned to Hamer the interest which Hamer had assigned to him March 2, 1910. While Bethea held the assignment from Hamer, the latter received net from the trustees—that is, between March 2, 1910, and October 20, 1913—$3,808.28, one-half of which, $1,904.14, was evidently received by Bethea.

The plaintiff Hamer, replying to the amended answer, in rather an informal manner, pleaded the Statute of Limitations to the cause of action set up by Rising to have the contract and assignment of February 16, 1910, set aside for fraud.

While I agree with the conclusion of Mr. Justice Purdy that Hamer took advantage of the mental weakness of Rising to drive a hard bargain with him, and think that, if Rising had moved in time, the transaction could and would have been set aside, I think that Rising is barred by his laches, his ratification and the lapse of time, in maintaining his claim. He testified that when he found out that he had assigned his interest to Hamer, he went to see Bethea about it; that Bethea told him that he had signed the paper; that he asked Bethea, "What chance is there to get shut (shed?) of it?" that Bethea told him: "You can't get shut of it; you made a bad trade, and you will have to stick to it." That happened in March, after the contract had been signed in February. He claimed then that he had not signed any contract, but that, if he had, he "was sure on a spree at the time." Then was the time for him to have moved in the matter. As his Honor Judge Dennis holds in his decree:

"These transactions were known to Rising, and he not only acquiesced in them but gave·his written approval on numerous occasions. It was only after Hamer and David got into this lawsuit that Rising took any action."

During all the years, 1910 to 1915, he recognized the validity of the contract by accepting the annuity which Hamer was obligated to pay him. Not only this, but when he was permitted to intervene in the action of *Hamer v. David,* he put in an answer relying upon the conveyance by him to Hamer of his interest, and the reconveyance by Hamer to him, and in his reply to the answer of David, he reiterated the same thing.

The attorney for Rising contends that Rising did not know of the fraud of Hamer until the reference disclosed the assignment from Hamer to Bethea of a half interest in the contract of February 16, 1910, and that for that reason he comes within the protection of Section 331 of the Code. Whether that transaction was a fraud or not has no bearing upon the validity of the original contract, unless it be shown that it was in pursuance of an agreement beforehand between Hamer and Bethea, looking to the acquisition by them jointly of Rising's interest, of which there is not a particle of evidence. The attack is based, not upon the transaction between Hamer and Bethea, but between Hamer and Rising, every particular of which was known to Rising within two months certainly, after it transpired. I do not think that it can be said that Rising did not have intelligence enough to know the facts upon which he now bases his charge of fraud, until he was told of them at the reference. The transaction between Hamer and Bethea was some evidence of the fact of Hamer's improper conduct in acquiring Rising's interest, but every fact in connection with it was known to Rising.

I think, therefore, that the attack upon the validity of the original transfer of February 16, 1910, has not been sustained.

Whether Hamer shall be required to account for the $2,000 which he exacted of Rising for the reconveyance of June 1, 1915, depends largely upon the facts which establish his improper conduct in connection with the original assignment. Why he should have been willing for $2,000 to reconvey an assignment which had netted him $7,000 in 5 years can be explained only by his consciousness that that transaction was not what it should have been. I think under the circumstances of that transaction he should have done for nothing, and accounted for his profits, that for which he charged Rising $2,000. He should therefore be charged with $2,000, with interest at 7 per cent. from June 1, 1915, to October 1, 1926, which amounts to $3,-586.66.

There is some confusion in reference to the payment by Gibson, one of the trustees, of $2,086.14, to Hamer on January 29, 1916. Mr. Justice Purdy is of opinion that that represented the $2,000 to be paid by Rising for the reconveyance with interest from June 1, 1915, and is influenced by the fact that $2,000 with 7 per cent. interest from June 1, 1915, to January 29, 1916, amounts to $2.092.55, quite near the payment of $2.086.14. Taken in connection, however, with the statement which Hamer sent to Gibson on January 28, 1916, and Gibson's reply of the 29th, I think it is clear that the $2,086.14 was not for the $2,000 with interest, but was for what Hamer claimed in that statement was due to him from the income of 1915.

The statement which Hamer submitted to the trustee Gibson, dated January 28, 1916, taken from the return of the trustees for 1915, shows:

Receipts  ................................$5,869.60
Expenses  ............................... 1,363.63
                                           ————————
    Balance  ............................$4,506.07
    (An error of 10 cents in subtraction.)
    This balance he apportioned:
January 1, 1915, to June 1, 1915  ............$1,877.50
June 1, 1915, to January 1, 1916  ............ 2,625.50
                                               ————————
                                           $4,506.00
    (An error of 7 cents.)

The $1,877.50 he claimed under the contract of February, 1910, and one-half of the $2,628.50 ($1,314.25), under the order of July 28, 1915, upon the trustees to divide equally the income of 1915 between him and Rising, which he induced Rising to approve.

He claimed that of the $1,314.25, Rising's half of the income from June 1, 1915, to January 1, 1916, Rising had received $628.25, leaving due him $686. The return of the trustees shows:

That the net balance of income was  ..........$2,772.14
From which deduct amount paid to Rising  ......  686.00
                                                 ————————
Leaving for Hamer  ......................$2,086.14

This interpretation is confirmed by the letter of Gibson of January 29, 1916, in which he says:

"I am inclosing herewith check for two thousand eighty-six and 14/100 ($2,086.14) dollars, which is the amount you are entitled to in the Price estate matter in accordance with your statement."

I think that, in the matter of the order on the trustees to pay Hamer one-half of the income from June 1, 1915, to January 1, 1916, Hamer imposed upon the credulity of Rising and obtained it without the slightest consideration,

within less than two months after he had reconveyed to Rising the entire interest which Rising had conveyed to him in February, 1910, and that he should account for the $1,-314.25 received by him in the check of $2,086.14 on January 29, 1916, with interest at 7 per cent., amounting as of October 1, 1926, to $2,296.05.

On July 28, 1915, Hamer received a check from Gibson for $900, which expressed upon its face, "For balance income to June 1, 1915." Thereafter he received, evidently upon his alleged contract of July 28, 1915 (the order on the trustees), the following sums:

September 4, 1915 ...........................$ 50.00
September 23, 1915 ..........................  50.00
October 8, 1915 ............................. 100.00
November 8, 1915 ........................... 100.00
November 26, 1915 ..........................  50.00
December 31, 1915 .......................... 100.00

Total ...............................$ 450.00

—for which he is accountable with interest from the several dates to October 1, 1926, $343.93, making a total of $793.-93.

It appears that Hamer received during the years 1914 and 1915, 15 bales of cotton, each year, upon the "side agreement" made by him and Dr. David, for which this Court has virtually decided in the first appeal (112 S. C., 211) that he is accountable.

1914—15 bales 500 lbs. each 7,500 lbs. at 6 2/3....$500.00
1915—15 bales 500 lbs. each 7,500 lbs. at 12...... 900.00
Interest on $500 Jan. 1, 1915, to Oct. 1, 1926.. 411.25
Interest on $900 Jan. 1, 1916, to Oct. 1, 1926.... 677.25

Total ...............................$2,488.50

On October 17, 1916, Gibson, trustee, issued a check to W. M. Rising for $2,366.96, and took credit therefor in his return. The check was indorsed by Rising and W. M. Hamer. It is plain that he received the money for it. There is no explanation in the evidence of this check, and it should be charged to Hamer. It evidently does not represent the $2,000 paid by Rising for the reconveyance, for the $2,000, with interest from June 1, 1915, to October 17, 1916, could not amount to as much as $2,366.96. The interest upon it from October 17, 1916, to October 1, 1926, amounts to $1,649.42—total $4,016.38.

In my opinion, therefore, judgment should be rendered in favor of the trustees and W. M. Rising against W. M. Hamer for the following amounts:

(1) For the amount received by Hamer as the consideration for the reconveyance ...........$2,000.00

    Interest at 7 per cent. from June 1, 1915, to October 1, 1926 .. 1,586.66 $ 3,586.66

(2) For the amount received by Hamer under the alleged agreement of July 28, 1915.. 1,314.25

    Interest at 7 per cent, from January 29, 1916, to October 1, 1926 ................... 981.80 $ 2,296.05

(3) For the additional amounts received by Hamer under the alleged agreement of July 28, 1915 ..................... 450.00

    Interest to October 1, 1926, upon the several amounts ......... 343.93 $ 793.93

(4) For the proceeds of cotton re-
     ceived by Hamer under the
     David "side agreement," in
     1914 ....................$   500.00

Interest January 1, 1915, to October
     1, 1926 .................   411.25
In 1915 .....................   900.00

Interest January 1, 1916, to October
     1, 1926 .................   677.25 $ 2,488.50

(5) For the amount received by
     Hamer from Gibson, trustee,
     October 17, 1916 ..........  2,366.96

Interest October 17, 1916, to
     October 1, 1926 ............ 1,649.42 $ 4,016.38

     Total .......................... $13,181.52

The decree of his Honor, Judge Dennis, should be modi-
fied accordingly. This being the opinion of a majority
of the Court, it is so ordered; the calculation of interest
to be counted to the date of filing remittitur.

MR. CHIEF JUSTICE WATTS and MR. JUSTICE MARION
concur.

MR. ACTING ASSOCIATE JUSTICE PURDY concurs in part
and dissents in part.

MR. ACTING ASSOCIATE JUSTICE PURDY (concurring and
dissenting) : This is an appeal from a decree made by his
Honor, Judge E. C. Dennis, and, as will appear by reference
to the statement made in the decree, the case has been twice
appealed to this Court. 112 S. C., 211; 99 S. E., 816; *Id.,*
124 S. C., 391; 117 S. E., 807. To this decree, W. M. Ham-
er, and W. M. Rising, and the present trustees of Hugh
P. Price's estate have filed exceptions.

The decree contains brief statements in relation to the controversy. At the risk of repeating that which appears in the decree, a short statement will be made:

Hugh P. Price, the testator, owned a considerable estate; his wife survived him; they had no children. He recognized W. M. Rising, an illegitimate, as his son, and he, with his mother, Mary Rising, lived on land belonging to the testator. By his will he appointed three of his friends as executors and trustees to carry out its term; one of these friends was W. T. Bethea.

Provision was made in the will for his wife for life, and, after her death, the estate was to be managed and the entire income paid to W. M. Rising during his lifetime. The testator died several years prior to 1910, and his wife did not long survive him.

Rising then became entitled to the income from the estate. He was thriftless and prone to run into debt, and was indebted at the time of Mrs. Price's death. W. M. Hamer, prior to 1910, had sold him land and had taken mortgages on the property sold, and, in addition to this, had an assignment of Rising's interest in the estate as further collateral to the indebtedness. It appears also that a bank, of which W. T. Bethea was cashier and manager, likewise had such an assignment. It appears from the testimony that W. T. Bethea was the trusted friend of the testator and was the controlling manager of his estate.

On February 16, 1910, W. M. Hamer procured from Rising a conveyance of his interest in the estate, which conveyance was recorded, and is as follows:

"State of South Carolina, County of Dillon.

"Know all men by these presents, that I Wilbur Monroe Rising, of the county and state aforesaid, for and in consideration of the sum of tweny-four hundred dollars ($2,-400.00) to be paid to me each and every year in monthly installments of two hundred dollars ($200) on the 1st and 10th of each month, beginning March 1st, after date, have

this day bargained, sold, and released and do hereby bargain, sell, and release to Wm. M. Hamer, his heirs or assigns, all my right, title, and interest in and to all the income of each and every kind due and payable to me under the last will and testament of H. P. Price, deceased.

"And I do hereby instruct, authorize, and empower W. T. Bethea, J. B. Gibson, and W. D. B. Hayes, executors of said will of H. P. Price in my name and stead, to pay said Wm. M. Hamer upon demand all amounts collected and due me each year as provided in said will.

"It is mutually understood that for the sixth year only the above annuity is to be increased one thousand dollars ($1,000) payable in monthly installments as above. It being nevertheless provided and further understood that the above monthly payments are subject to any liabilities legally binding upon me or the estate of said H. P. Price, deceased, all of which are to be paid out of said annuity to the full satisfaction of said Wm. M. Hamer.

"Witness my hand and seal this the 16th day of February, 1910.

"W. M. Rising. [L. S.]

"Witness: Geo. G. Stanton, E. P. Mobley, Jr."

On March 2, 1910, Hamer conveyed to W. T. Bethea one-half interest in the above conveyance of the profits arising from the estate; such conveyance being as follows:

"State of South Carolina, County of Dillon.

"Know all men by these presents that I, Wm. M. Hamer, of the county and state aforesaid, for and in consideration of five dollars and services to be performed in making all collections and looking after property, do hereby transfer, set over and assign to W. T. Bethea one-half interest in and to all amounts due me under conveyance of Wilbur Monroe Rising, dated February 16, 1910, of all his rights, title, and interest in and to all incomes of any and every kind under the last will and testament of H. P. Price, deceased.

"Provided, neverthless, that the said W. T. Bethea participates to the extent of one-half of all debits as well as credits under the above-mentioned conveyance of said Wilbur Monroe Rising and assigns to me one-half interest in an insurance policy with the South Atlantic Life Insurance Company, on the life of said Wilbur M. Rising—upon my paying one-half of all subsequent premiums.

"Signed the 2d of March, 1910.

"W. M. Hamer. [L. S.]

"I hereby accept and agree to the above agreement. Signed this 2d day of March, 1910.

"W. T. Bethea."

This conveyance was not divulged until September, 1920, and, when divulged, Rising's attorney moved to set aside all the transactions which had taken place between Hamer and Rising.

A voluminous record has been made and brought to this Court. This record is so cumbersome that it is confusing.

While the exceptions filed by Hamer are five in number, they practically relate to but one subject of error, viz.: He complains that there was error in not holding that he (Hamer) was entitled to retain the 15 bales of cotton for the years subsequent to 1915, when he had expressly reserved them in the resale to Rising, and in holding that he could not retain this benefit after his interest in the estate had ceased.

These exceptions are all overruled, for the reasons stated by his Honor, Judge Dennis, and for the further reasons which will hereafter appear in discussing the exceptions raised by Rising and his present trustees.

Rising and the trustees, on the other hand, have filed twenty-three exceptions, which, for the most part, may be disposed of in a general manner. Every finding adverse to Rising and the trustees is excepted to, commencing with assailing the contract of February 16, 1910, and everything done under it or arising from it.

While it is true that his Honor, Judge Dennis, had Rising before him and had an opportunity to observe his demeanor, at the same time, from the record, this Court cannot ascribe that degree of intelligence which is credited to him by his Honor. As is disclosed by the record, Rising is a weakling, handicapped in the first place by his unfortunate birth and by a lack of capacity to judge of values or to plan for the welfare of himself and those dependent upon him. The testimony is overwhelming that the will of a strong person dealing with him could be substituted for his will, and that he was powerless in dealing with persons of intelligence who might desire to take advantage of him. In addition to this fact, disclosed by the records which fully convince the Court of this fact, there is added the testimony to the same effect of a number of first-class business men who know him. One of them says that if Rising wanted a thing worth $100 he would buy it if he had to pay $1,000 for it. All agree that he could be easily imposed upon, and several express the opinion that he needs a guardian.

Hamer, on the other hand, is shown to be a man of wonderful business ability, and W. T. Bethea, having been the close personal and trusted friend of the testator, had the complete confidence of Rising.

Practically every fact put down in the record demonstrates Rising's incapacity, save that he appears to have been fortunate in the outcome of the real estate purchased from Hamer.

Just how the contract of February 16, 1910, was obtained from him is not very clear. He claims that he knows nothing about it, and must have been drunk at the time. That prior to 1910 he was a shiftless person, addicted to drinking, does not appear to be questioned. Rising says that he knew nothing about this trade until he got the paper from McLaurin (evidently referring to a duplicate). McLaurin, a merchant, not interested, says that, while he is not certain about the exact date, as a matter of fact, Rising came in his

store one night and fell in a drunken stupor, and, some papers having fallen from his pocket, he took them and put them in his safe, and one of them appeared to be the paper with Hamer, which was afterwards delivered to Rising.

Hamer denies having taken advantage of Rising, and claims that the contract was beneficial to him. Whether he was drunk when the paper was signed or not is immaterial from the view that we take of this case, and whether he repeatedly ratified it afterwards is also immaterial. That he did ratify it and did many times express satisfaction with Hamer's dealings with him also cannot be disputed; but the evidence shows that he was never any more qualified to *approve* than he was to *make* the contract in question, and his after approvals and the manner of making them show his weakness, instead of giving strength to the contention that he ought to be bound by it.

He wrote many letters in which the greatest confidence was expressed in Hamer, and showing at all times his entire willingness to acquiesce in whatever Hamer suggested. We are satisfied also from the testimony of Mr. T. I. Rogers that Rising told Hamer in his presence that he understood that he was getting back the contract only to the extent of the 60 bales of cotton, and that the 15 bales of cotton were not to go to him, and in that interview that Hamer reminded him that Mrs. Rising said, "Let Hamer keep it and make old David pay." We do not think that there is any doubt that this took place. It only tends to show in what little estimate he held what belonged to him, and it could be attributed only to one thing, and that is his inability to comprehend his rights.

The record shows that more than one time he said, and declared in writing that Hamer had always treated him right. He says, however, that some time in March, 1910, he went to Bethea and complained and that Bethea told him that he had made the bargain and would have to stand it. Bethea is dead, this testimony was objected to, and should

have been ruled out; it can have no effect on the judgment of the Court, and is not considered. He says that at the same time he went to Hamer and complained, and then detailed what took place between Hamer and himself, but no recision of the contract resulted.

An arrangement was made by which $100 a month was paid to one of his creditors, the bank of which Bethea was cashier and manager, $50 to Hamer on account of what was owing to him, and $50 to Rising's wife for the support of the family, and it appears that from the year 1910 to 1915, when he was working at all, he earned from $1 to $1.50 per day, doing odd jobs at one thing and another, and his wife says that she worked to help keep the children at school. It is true that during this period his indebtedness was being reduced to the extent of these payments, and to that extent the relation was beneficial to him, but, had he received all of the income to which he was entitled, and had it been administered by his trustees as was contemplated by his benefactor, it could have been much further reduced, without hardship to him. W. T. Bethea was a capable business man, known and respected. He was chosen by the testator to protect the estate, and while he was not denominated as the committee of Rising, he was obligated to protect his interest. He managed it successfully for Hamer and himself part of the time.

On June 1, 1915, Hamer reconveyed to Rising the interest which he had purchased from him, intending to reserve out of the conveyance the 15 bales of cotton for the unexpired term of years under the lease, and the terms of the conveyance would bear the construction that it was reserved. The conveyance is so worded, however, that, to one not having knowledge of the existence of the contract for the 15 bales of cotton, it would not be discovered on reading the conveyance. In fact, Hamer did not desire that this should be known, and he had his reasons for it.

After complying for two years with the contract to pay the 15 bales of cotton, David refused to pay any more, alleging that this contract had been obtained by Hamer by Fradulent means. Hamer brought suit for the enforcement of the contract, and, as appears from the record it was then simply an action of Hamer against David on that contract.

The finding in David's favor was reversed, on appeal (112 S. C., 211), and the order made in this case, to bring in other parties, resulted in bringing all of the parties into the controversy who are now before the Court; they have filed pleadings of great length, setting forth their respective interests and claims. The true status of the dealings in reference to the estate commenced to unravel at a reference held in September, 1920. It appears that during the examination of Hamer he said that he had to give half of the profit under his contract with Rising to W. T. Bethea, and produced the paper. After this disclosure, the pleadings were further amended by Rising, who then sought to set aside all transactions growing out of Hamer's relations with the estate.

After the decision of the case, Dr. David, without any consideration whatever, procured Rising to release him (Dr. David) from the performance of the contract to deliver the 15 bales of cotton for the then unexpired term of the lease. This act, standing by itself, can be taken as strong evidence to bear out the contention of Rising and his present trustees that he can be persuaded to sign any paper at the instance of a person of superior intelligence, and is another evidence of his incapacity, as showing his willingness to surrender this valuable asset for nothing.

In this transactiou, however, Dr. David must not be judged harshly. He felt that he had been overreached, and that he should not have been required to pay the additional 15 bales of cotton. Feeling his way, he thought he should be relieved of it, whether the contract should inure to the

benefit of Hamer or Rising. Upon appreciating the situation, he surrendered his release obtained from Rising, and acknowledged himself bound by his contract, and, it appears, endeavored to carry it out in good faith. Therefore the obtaining of this release from Rising, so far as Dr. David was concerned, is referred to only to show the weakness of Rising.

Another evidence of the incapacity of Rising is shown from the fact that on July 28, 1915, he, without any consideration, signed a paper giving Hamer half of the income arising from the estate for the year 1915, beginning June 1st, "this is to continue until otherwise notified in writing by me" (that is, Hamer). That paper is as follows:

"Dillon, S. C., July 28, 1915.

"Mr. J. B. Gibson, Executor, Estate of H. P. Price, Dillon, S. C.—Dear Sir: In answer yours, I am requested by Mr. W. M. Rising to say that it is agreeable with me for you to divide equally between us all cash collected as specific income for 1915, beginning June 1st, provided two checks for same are issued at the same time, one payable to him and one to me, after reserving such amount to cover expenses of said estate as your judgment and pleasure dictates.

"This to continue until otherwise notified in writing by me.

"Very truly yours.                    W. M. Hamer."

"The above has been read by me, and is not only perfectly fair, but all I ask of said W. M. Hamer.        W. M. Rising.

"Witness: L. A. Tatum."

It will be noted that at its conclusion. Rising says: "The above has been read by me, and is not only perfectly fair, but all I ask of said W. M. Hamer," and is signed by Rising in the presence of a witness. This can only be explained in the light of incapacity attributed to Rising.

In all of these transactions, it is significant that Rising stood alone, without the aid of counsel, and, as appears from

what was done, not only without the aid of the managing trustee, W. T. Bethea, but with Bethea as a person hostile to his interests, although his trustee. W. T. Bethea died in the spring of 1915, and hence the contract between himself and Hamer was not made public until after his death. Having joined with Hamer in taking the benefit from the estate, he as well as Hamer, became liable for whatever sums were diverted in this way.

There is a letter in the record from Bethea to Hamer as early as June 23, 1913, which shows that Bethea was not satisfied with the part that he was taking in reference to the matter. He says:

"Morris Fass is continually after me about judgment he holds against Wilbur Rising. He tells me he got this judgment before you made contract with him. Don't you think it would·be better for you to make some kind of settlement with him, rather than have the whole thing aired in Court?"

Answering this on June 18th, Hamer says that he does not understand what is meant by "aired in Court," and says further:

"I have never yet had a business transaction that I objected to be 'aired' before any tribunal. You once wrote me that you though best for you not to participate in the profits, but the tempter evidently got hold of you later and changed your heart. Now let me suggest, if your conscience object, as meaning 'aired in Court' considered and let me hear again from you. Mr. Rising is better off financially and morally than he was before making this deal with me, and he did so after full consultation and at the instance of some of his best friends. Up to. date there has been no fortune to me in it. Had he not made a deal with me, his judgment record ere this would have meant nothing monthly for him and his family."

On October 20, 1913, Hamer accepted the proposition made him by Bethea for his half interest in the Rising contract. For this, and his interest in an insurance policy on

the life of Rising, Hamer gave him a one-third interest in Bethea & Moore Insurance Agency. In this letter of acceptance, Hamer added:

"It being mutually agreed that you are to pay all insurance premiums debited against me by said agency to date and that you will continue to look to my interest in handling said estate as you assured me you would do."

From all of the foregoing, it is manifest that the following conclusions must be and are reached, viz.: That Rising, while of a certain degree of intelligence, is of that class known as "morons," without sufficient intelligence to comprehend the nature and effect of the contract that he was entering into with Hamer on the 16th day of February, 1910, and that such contract is void and all benefits received under it must be accounted for by Hamer. That W. T. Bethea, having breached his trust and made it possible for Hamer to take this unconscionable advantage and overreach Rising, is equally responsible with Hamer for the return of the fruits of such contract. That, while Hamer did not occupy a fiduciary or trust relationship to Rising in reference to the property at the time he made the contract, Rising had great confidence in him, and Hamer's superior intelligence dominated and overcame the will of Rising, and, by the terms of the contract referred to, he became Rising's trustee, *ex maleficio.*

It does not need the citation of authority to show that Bethea not only could not take the benefit of the estate, but was bound to protect Rising. We have found no better statement of the principle than the following, taken from *Ex parte Gadsden,* 89 S. C., at pages 363, 364; 71 S. E., 952, 956:

"Judicial distrust of such transactions runs through the whole history of jurisprudence and has been expressed with emphasis in a number of cases in this state. The general rule against the validity of such transactions does not depend on a presumption that there was actual fraud or intentional wrong, but on the principle that the trust relation

places such obligations on the trustee that he shold not oc-
cupy that position of opposition to his *cestui que* trust which
trading with him denotes, and on the presumption that the
trustee by reason of his superior knowledge of the trust es-
tate occupies such a vantage ground that the parties do not
deal on equal terms.  There are, it is true, exceptions to
the rule, and such transactions may be sustained when there
is clear affirmative proof of a fair consideration, perfect
candor, and of the absence of advantage of superior infor-
mation; in other words, when the *cestui que* trust deals on
equal terms and is fully advised of what he is doing and the
effect of his act.  The absence of full information and in-
dependent advice is always regarded a strong circumstance
against the validity of the transaction.  Among the many
authorities on the subject we cite the following: *Butler v.
Haskell,* 4 Des. Ch., 698.  *McCants v. Bee,* 1 McC. Ch.,
383 [16 Am. Dec., 610].  *Parris v. Cobb,* 5 Rich. Eq., 450.
*Way v. Union C. L. Ins. Co.,* 61 S. C., 501; 39 S. E., 742.
*Scottish Am. M. Co. v. Clowney,* 70 S. C., 229; 49 S. E.,
569 [3 Ann. Cas., 437].  *Tindal v. Sublett,* 82 S. C., 199;
63 S. E., 960; 22 L. R. A. (N. S.), 435n; Perry on Trusts,
§ 194 *et seq.*"

In the reconveyance to Rising, Hamer got $2,000.  This
was without consideration, and must be returned with in-
terest.  His contract was void and valueless.  But Bethea
got no part of this money, and is not liable for it.

The contract for the repurchase of the interest at $2,000
took effect June 1, 1915, but the $2,000 was not then paid.
There appears in the record check No. 6071 under the head
of "Check of J. B. Gibson to W. M. Hamer, January 15,
1916, for $2,086.14."  Then follows: "Dillon, S. C., Jan.
29, 1916.  The Bank of Dillon.  Pay to the order of W. M.
Hamer, $2,086.14, two thousand eighty-six 14/100 dollars."
Signed: "J. B. Gibson."  Indorsed: "W. M. Hamer."
Gibson says that he was instructed by Rising to make this

payment to Hamer, and a statement is referred to as made by Hamer, but there is no statement to which this check is applicable.

In the argument of the attorney for Rising, he says that the check for $2,086.14, dated January 29, 1916, was the $2,000 reconveyance price, with interest from June 1, 1915, and this we think is correct. A calculation of the interest on $2,000 at 7 per cent. would be just a little bit more than this, but so small a difference as to make the two practically identical.

On October 17, 1916, we find a check for $2,366.96, by Gibson, as executor, to W. M. Hamer. As to this check, counsel says in his argument:

"The check for $2,366.96 was the payment of the $2,000 reconveyance price, with interest thereon to the date of the check, and the check for $2.086.14 was supposed to pay up the final casting of accounts between Hamer and Rising." —but says that Hamer's statement does not show that this is the difference between them on debts owed by Rising to Hamer, but adds:

"In fact, no explanation of this fact is made in the testimony by Hamer. But Gibson and Hamer testify that it is agreeable with Rising to pay this amount."

We do not find any item in the record to which the check for $2,366.96 could be applied. Counsel is mistaken when he says that it was for the reconveyance price paid by Rising to Hamer. As shown, this contract went into effect on June 1, 1915, and this check is dated October 17, 1916, one year four months and a half later, and by no calculation could the interest amount to $366.96.

Counsel for Rising also states in his argument that Hamer should be made to account for the amount received as half of the income, under the paper given by Rising to Hamer, July 28, 1915, but the statements on the record do not point with certainty to what this amount is; that is to say, we are

unable, in the mass of figures, to pick out the items making the amount claimed. They may be there, but we have not been able to definitely ascertain them, so as to fix liability against Hamer. Besides counsel asks for final judgment:

(1) That the funds and collaterals now in the hands of the trustees, as shown in the records, be declared to be the funds and property of the estate of Hugh P. Price, to be held for the estate and paid to Rising as income. The reference does not correspond with the folio in number, but the statement is so closely allied to the place of reference, that we take the following, which we find in the record:

"Statement of Status of 15-Bale Contract.

"I. For the year 1914, 1915, collected by W. M. Hamer, as shown in testimony.

"II. For the years 1916, 1917, 1918, 1919, 1920, 1921, 1922, collected by the trustees as follows:

"(a) Notes and mortgage by J. H. David, dated May 27, 1921, in real estate for six thousand ($6,000) dollars, payable in five (5) equal installments of twelve hundred ($1,200 dollars each, due respectively May 27, 1922, 1923, 1924, 1925, 1926, interest before maturity, 7 per cent. and after maturity, 8 per cent.

"(b) Certificate deposit at First National Bank, Dillon, S. C., eight thousand eight hundred nine and 19/100 ($8-809. 19) dollars, dated February 26, 1925, at interest at 4 per cent."

These items can be disposed of by here finding and declaring that the same are the funds and property of the estate of Hugh P. Price, to be held by the trustees and paid to Rising as income, as suggested in the argument, and as shown by the record.

(2) In his second specification, counsel asks for judgment against Hamer in the sum of $2,818.41, which he claims is the proceeds, with interest added, to October 19, 1925, of the cotton collected by Hamer from David for

the years 1914–1915 from the 15-bale contract. We find that Hamer is liable for the money received for the cotton for these two years, with interest, but the amount claimed is not correct, and will be corrected in the further finding in relation thereto.

(3) The third request for judgment is against Hamer and Bethea in the sum of $16,464.74, with interest from August 1, 1923, alleged to have been received by Hamer under the contract of February 16, 1910; the claim being further made that the total sum, with interest up to October 15, 1925, is $17,713.31. While judgment must be given against Hamer for the items referred to, the amount claimed is not correct and will be corrected in further disposing of this item. Reference to the tabulation upon which this claim is based shows that compound interest was charged on all of the items which made the calculations amount to the same as stated. This method of calculation is not correct, and is not approved. Courts do not favor allowing compound interest. *Baker* and *Wife v. La Fitte,* 4 Rich. Eq., p. 392 (now 25 S. C., Eq.).

(4) The fourth claim is for judgment against Hamer, in the sum of $2,086.14, with interest from January 29, 1916, but the attorney for Rising says that this is an unexplained check. We do not find this to be the case, but find it to be the check which was paid by Rising to Hamer for the reconveyance as of June 1, 1915. But the attorney for Hamer contends that this Court will not, "nor indeed has it the jurisdiction, to review matters not passed on by the lower Court. In fact, there are no exceptions to his Honor's decree relative to the accurancy of or the amounts shown by the accounting. We would have serious objection to much of the amounts claimed, were these involved in this appeal. His Honor, Judge Dennis, however, decided the case without ruling on the amounts, a consideration of them

being unnecesary, and they are not, therefore, before this Court."

The answer to this suggestion is that the whole matter was before his Honor, Judge Dennis, and, having found adversely to Rising and his trustees, there was not any amount to fix. *But the accounts were put in evidence, and were before the Court.* If there be errors in the statements, they have not been pointed out. We are not taking, but are rejecting, the audit made by Braddy, as being founded on a wrong basis. We are relying entirely on the returns made by the trustees, except that Braddy puts down the correct amount as given by the trustees, and then gives credit for $140 error, and in that respect his audit is more favorable to Hamer, as is next shown.

It will be noted that the income for the year 1910 is put down by the executors and trustees as $3,852.38. In this Brady says there is an error of $140, and takes it off and leaves the charge of $3,712.38, and this latter sum we are adopting in our findings.

The whole matter was before his Honor, Judge Dennis, and, had he found for Rising and his trustees, he would have had the basis for just findings as we have here arrived at *from the record.*

The exceptions for the most part relate to the setting aside of the contracts. The seventeenth exception alleges error in not requiring Hamer to return the proceeds of the 1914 and 1915 cotton, with interest.

The twenty-second exception is general, and is as follows:

"That his Honor erred, it is respectfully submitted, in holding in effect that, as between Risng and Hamer, as to the 15-bale contract, the equities were equal, and ordering each to pay his costs herein, in that he should have held that every transaction between the parties reeked with fraud and inequitableness, and Hamer should make restitution to

Rising of all profits derived under all of said transactions and be required to pay all costs of Court."

These exceptions are sufficiently broad to enable the Court to settle all the issues, including the accounting, and the Court, having found that the contracts were inequitable and void, would fall far short of its duty if it simply sent the case back without doing its full duty towards ending litigation when within its power and jurisdiction to do so, and it may clearly settle any issue that arises in a case within its jurisdiction when called to its attention, or on its own motion, in promoting the ends of justice.

In pursuance of the conclusions of the Court, the following results have been attained:

(1) That Rising and his present trustees, Rogers and Adams, are entitled to judgment against Hamer, in the sum of $2,484.58, which is for the account of the 15-bale contract, with interest to December 1, 1925, and this is arrived at by taking $487.50 for 1914 and calculating interest on it from January 1, 1915, and taking $900 for the cotton for 1916, and calculating interest on it from January 1, 1916, and these items make the total above stated, and, in addition thereto, they are entitled to judgment against Hamer for $3,529.03, which is the amount that Rising paid for the reconveyance of his interest to him, with interest to December 1, 1925, and, in addition to the foregoing, Rising and his trustees, Rogers and Adams, are entitled to judgment against Hamer in the sum of $11,351.37, which is the profit derived from the Price estate, over and above the $2,400 per annum paid to Rising, calculated at the end of each year, for the years 1910, 1911, 1912, 1913, 1914, 1915, and judgment may be forthwith entered up in the clerk's office for Dillon County against W. M. Hamer, for the total of the foregoing mentioned sums of money, in accordance with the foregoing findings.

We have found that W. T. Bethea was liable for the sums of money paid to him on account of this estate by Hamer, but, in view of the statements made in the argument of counsel for Rising and his trustees, we have determined to give judgment against Hamer alone, and leave is granted to him in this cause to apply in the Circuit Court for judgment against the estate of Bethea for whatever sums or property he may have paid or delivered to W. T. Bethea on account of sums received from the Price estate, leaving Hamer and the estate of Bethea to settle the matter as between themselves.

Judgment is given in favor of Rising and his trustees together, so that the matter may be handled through the trustees. The Court has not been able to find with such certainty as will enable it to base a judgment, what amount was paid under the agreement made by Rising on July 28, 1915, to divide with Hamer the specific income, nor do the facts disclose on what basis the check referred to, for $2,366.96 was paid to Hamer. The Court does not feel that, under the testimony now before it, it can give judgment on these items. The litigation should be ended; yet, if any definite sum can be found as having been paid under the contract of July 28, 1915, or if this last-named check can be traced as an amount received under the contract of February 16, 1910, and not embraced in the findings, Hamer should be required to account for and pay this item, as well as any sums received under the contract of July 28, 1915. Under our findings, he would be liable for such payments, if they can be properly traced; otherwise he would not be liable.

Since it appears from the record that J. B. Gibson became a trustee after the death of W. T. Bethea, an original trustee, it is only fair to Mr. Gibson to make this statement, taken from the argument of the attorney for Rising and the trustees:

"Mr. Gibson at no time knew anything of any of the transactions between Bethea and Hamer and there is no real ground to claim that he did. There being no testimony that he did know of this transaction or had any knowledge of the actual fraud perpetrated, the attorney for Rising and present trustees have therefore never had any desire or reason to claim anything against him, and we so stated before Judge Dennis when this case was tried on its merits. However, Mr. Gibson did resign as a member of the board, and we think he acted properly in so doing, and he was not a member of the board when the testimony was taken before Sam McLaurin, referee."

The exceptions of W. M. Hamer are overruled, and the exceptions of Rising and the trustees are sustained in conformity with the findings herein.

There is one exception which has not been discussed, viz. the twenty-second exception, which alleges error in apportioning the costs. This exception is well taken and is sustained, and Hamer is adjudged to pay all costs and disbursements.

The decree is modified in accordance with such findings, and the case is remanded to the Circuit Court for the entry of judgments as indicated, with leave to Rising and his trustees, if they be so advised, to pursue in the Circuit Court a further inquiry upon the matter of charging Hamer under the contract of July 28, 1915, and the check for $2,366.96.

Let the decree of his Honor, the Circuit Judge, be reported.

### Order on Petition for Rehearing

*Per curiam.* Upon consideration of the petition for a rehearing of this appeal, it is ordered:

This Court having sustained the original transaction between Hamer and Rising by which Hamer acquired the interest of Rising in the Price estate, for the same reasons should have sustained the payment of $2,000

made by Rising for a reconveyance of such interest. The judgment of this Court should therefore be modified by relieving Hamer from accountability for the $2,000, with interest from June 1, 1915, to October 1, 1926, $1,586.66— total $3,586.66.

(2) That Rising account to Hamer for note of March 30, 1917, $120, with interest at 8 per cent., payable annually from maturity (not stated in the case).

With these corrections the petition will be dismissed and the stay of the remittitur revoked.

MR. ACTING ASSOCIATE JUSTICE R. O. PURDY: While the Court has found as is recited in the foregoing order, it logically follows that this order is proper, and for that reason I join in the order, but in no way changing my views as to the correctness of the position expressed by me in the original opinion filed by me.